## LOUISIANA *v.* JUMEL.

### ELLIOTT *v.* WILTZ.

1. By force of the act of the legislature of Louisiana, known as Act No. 3 of 1874, and the constitutional amendment adopted in that year, which provided that bonds should be issued under that act in exchange for valid outstanding bonds and warrants at the rate of sixty cents in the new bonds for one dollar of the old bonds and warrants, the State entered into a formal contract, the obligation of which it was forbidden by the Constitution of the United States to impair, and thereby stipulated with each holder of the new bonds so issued that an annual tax of five and one-half mills on the dollar of the assessed value of all the real and personal property in the State should be levied and collected, and the income therefrom applied solely to the payment of the bonds and coupons; that the tax levied by the act and confirmed by the Constitution should be a continuing annual tax until the bonds, principal and interest, were paid in full; that the appropriation of the revenue derived therefrom should be a continuing annual appropriation; and that no further authority than that contained in the act should be required to enable the taxing officers to levy and collect the tax, or the disbursing officers to pay out the money as collected in discharge of the coupons and bonds.
2. After the said act of 1874 was passed, and the constitutional amendment sanctioning it was adopted, sundry parties, citizens of another State, exchanged

their old bonds for new coupon bonds executed pursuant to the requirements of that act, and demanded of the proper State officers payment of the coupons which fell due Jan. 1, 1880, and the application thereto of the funds collected under the levy imposed by the act. Payment was refused solely on the ground that it was forbidden by the third article of the State Debt Ordinance of the new Constitution adopted July 23, 1879, *post*, p. 715; and the treasurer claimed to hold the funds only for the purposes for which they were appropriated by the terms of that Constitution. The parties then brought in the State court of Louisiana a suit for a *mandamus* against the auditor and treasurer of state and the other members of the board of liquidation, requiring them to apply the funds in the treasury derived from the taxes levied or to be levied to the retirement of the bonds, and to execute the said act according to its intent and purpose. They also brought in the Circuit Court against the same defendants a suit praying for an injunction forbidding them to recognize as valid said ordinance, and to oppose the full execution of said act and the constitutional amendment. The suit for *mandamus* was removed to the Circuit Court. *Held*, 1. That the ordinance forbade the payment of the interest due January, 1880, and withdrew from the officers of the State the means of carrying her contract into effect. 2. That the execution of the contract cannot be enforced, nor the relief sought be awarded, in a suit to which she is not a party, but which is brought against officers, who are merely obeying the positive orders of the supreme political power of the State. 3. That at the time the bonds were issued or since no statute or judicial decision authorized a suit against Louisiana in her own courts, nor can she be sued in the courts of the United States by a citizen of another State. 4. That the money in her treasury is her property, held by her officers, not in trust for her creditors nor as their agents, but as her servants, and that the courts cannot control them in the administration of her finances, and thus oust the jurisdiction of the political power of the State.

THE first case is in error to the Circuit Court of the United States for the Eastern District of Louisiana, and the second is an appeal from that court.

The case is stated in the opinion of the court.

*Mr. Wheeler H. Peckham* and *Mr. George S. Lacey* for the plaintiff in error and the appellant.

*Mr. John A. Campbell, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The legislature of Louisiana, at its session of 1874, by an act known as Act No. 3 of 1874, provided for an issue of bonds, to be designated as consolidated bonds of the State, for the purpose of consolidating and reducing the floating and

bonded debt. The bonds were to be payable to the bearer forty years from Jan. 1, 1874, and to bear interest at the rate of seven per cent per annum, payable on the first day of July and the first day of January in each year. The amount was not to exceed in the aggregate fifteen million dollars. The governor, lieutenant-governor, auditor, treasurer, secretary of state, speaker of the House of Representatives, and a person to be elected by these officers as a fiscal agent of the State, were created a board of liquidation, with power to issue the bonds and exchange them for all valid outstanding bonds and certain valid warrants on the treasury, at the rate of sixty cents in the new bonds for one dollar of old bonds and warrants. The bonds were to be signed by the governor, auditor, and secretary of state, and the coupons by the auditor and treasurer.

Section 7 of the act is as follows : —

"That a tax of five and a half mills on the dollar of the assessed value of all real and personal property in the State is hereby annually levied, and shall be collected for the purpose of paying the interest and principal of the consolidated bonds herein authorized, and the revenue derived therefrom is hereby set apart and appropriated to that purpose, and no other. And that it shall be deemed a felony for the fiscal agent or any officer of the State or board of liquidators to divert the said fund from its legitimate channel as provided, and upon conviction the said party shall be liable to imprisonment for not more than ten years nor less than two, at the discretion of the court. If there shall, during any year, be a surplus arising from said tax after paying all interest falling due in that year, such surplus shall be used for the purchase and retirement of bonds authorized by this act, said purchases to be made by the said board of liquidation, from the lowest offers, after due notice : *Provided*, that the total tax for interest and all other State purposes, except the support of public schools, shall never hereafter exceed twelve and a half mills on the dollar. The interest tax aforesaid shall be a continuing annual tax until the said consolidated bonds shall be paid or redeemed, principal and interest ; and the said appropriation shall be a continuing annual appropriation during the same period, and this levy and appropriation shall authorize and make it the duty of the auditor and treasurer, and the said board, respectively, to collect said tax annually, and pay said interest and redeem said bonds until the same shall be fully discharged."

By other sections it was provided that any judge, tax-collector, or any other officer of the State obstructing the execution of the act, or any part of it, or failing to perform his official duty, should be deemed guilty of a misdemeanor, and on conviction thereof punished; that each provision of the act should be, and was declared to be, a contract between the State of Louisiana and each and every holder of such consolidated bonds; that the tax-collectors should not pay over any moneys collected by them to any other person than the State treasurer, and that no court, or judge thereof, should have power to enjoin the payment of principal or interest of any of the bonds, or the collection of the special tax therefor.

Immediately after the passage of this act the State adopted an amendment to its Constitution, as follows: —

"The issue of consolidated bonds authorized by the General Assembly of the State, at its regular session in the year 1874, is hereby declared to create a valid contract between the State and each and every holder of said bonds, which the State shall by no means and in no wise impair. The said bonds shall be a valid obligation of the State in favor of any holder thereof, and no court shall enjoin the payment of the principal or interest thereof or the levy and collection of the tax therefor; to secure such levy, collection, and payment, the judicial power shall be exercised when necessary. The tax required for the payment of the principal and interest of said bonds shall be assessed and collected each and every year until the bonds shall be paid, principal and interest, and the proceeds shall be paid by the treasurer of the State to the holders of said bonds, as the principal and interest of the same shall fall due, and no further legislation or appropriation shall be requisite for the said assessment and collection, and for such payment from the treasury."

Under this authority, consolidated bonds to the amount of about twelve million dollars were issued. John Elliott, Nicholas Gwynn, and Henry S. Walker are the holders and bearers of these bonds to the amount of $20,000, and of unpaid coupons due Jan. 1, 1880, to the amount of $78,900. The bonds, in accordance with the requirements of the act under which they were issued, are signed by the governor, auditor,

and secretary of state, and the coupons by the auditor and treasurer.

On the first day of January, 1880, a new Constitution of Louisiana went into effect. A portion of that Constitution, called the " Debt Ordinance," is in these words: —

### " STATE DEBT.

" ART. 1. *Be it ordained by the people of the State of Louisiana, in convention assembled,* That the interest to be paid on the consolidated bonds of the State of Louisiana be and is hereby fixed at two per cent per annum for five years from the first day of January, 1880, three per cent per annum for fifteen years, and four per cent per annum thereafter, payable semi-annually ; and there shall be levied an annual tax sufficient for the full payment of said interest, not exceeding three mills, the limit of all State tax being hereby fixed at six mills: *Provided,* the holders of consolidated bonds may, at their option, demand in exchange for the bonds held by them, bonds of the denomination of five dollars, one hundred dollars, five hundred dollars, one thousand dollars, to be issued at the rate of seventy-five cents on the dollar of bonds held and to be surrendered by such holders, the said new issue to bear interest at the rate of four per cent per annum, payable semi-annually.

" ART. 2. The holders of consolidated bonds may at any time present their bonds to the treasurer of the State, or to an agent to be appointed by the governor, — one in the city of New York and the other in the city of London, — and the said treasurer or agent, as the case may be, shall indorse or stamp thereon the words, interest reduced to two per cent per annum for five years from January 1, 1880, three per cent per annum for fifteen years, and four per cent per annum thereafter: *Provided,* the holder or holders of said bonds may apply to the treasurer for an exchange of bonds, as provided in the preceding article.

" ART. 3. *Be it further ordained,* That the coupon of said consolidated bonds falling due the first day of January, 1880, be and the same is hereby remitted, and any interest taxes collected to meet said coupon are hereby transferred to defray the expenses of the State government."

Article 209 of the same Constitution provides that " the State tax on all property for all purposes whatever, including expenses of government, schools, levees, and interest, shall not exceed in any one year six mills on the dollar of its assessed valuation."

Elliott, Gwynn, and Walker demanded of the proper State officers payment of their coupons which fell due Jan. 1, 1880; but such payment was refused, the auditor and treasurer stating " that they could not comply with the request made of them, owing to the prohibition contained in art. 3, State debt ordinance of the Constitution of the State of Louisiana, adopted 23d July, 1879, and recently promulgated."

All the taxes allowed by the new Constitution have been levied for the year 1880, but no proceedings have been taken to levy and collect the five and a half mill tax under the act of 1874. About $300,000 is in the treasury of the State, collected under the levy imposed by the act of 1874 to meet the coupons falling due January, 1880 ; but the treasurer refuses to apply it to the payment of the coupons, and claims to hold it only for the purposes to which it was to be appropriated by the terms of the new Constitution. There are also taxes levied for former years under the act of 1874, which remain uncollected, and are subject to future collection and payment into the treasury under the operation of the collection laws.

In this condition of things, said Elliott, Gwynn, and Walker, on the 16th of January, 1880, commenced a suit in equity in the Circuit Court of the United States for the Eastern District of Louisiana, against the several officers of the State composing the board of liquidation. The prayer of the bill is that it may be " ordered, adjudged, and decreed " that the act No. 3, of 1874, " so far as your orator's interests herein above declared are concerned, was all the time from its passage, has been, and, at the time of the rendition of the decree herein prayed for, is a valid and subsisting law of the State of Louisiana; that the act aforesaid, the constitutional amendment of 1874, and the several bonds and coupons of interest, held and owned by your orators as aforesaid, separately and together, constituted, were, and are, good, valid, subsisting, and binding contracts between the State aforesaid and the bearers and holders of the consolidated bonds and coupons, the obligation of which contract cannot be lawfully or constitutionally impaired; and that, under and by virtue of such contract, your orators were and are entitled to take and enjoy all the rights, privileges, taxes, and moneys, particularly set forth and mentioned in act No. 3, and

the constitutional amendment of 1874, aforesaid; that so much of the aforesaid Constitution of 1879 as alters, varies, modifies, or changes, or assumes, purports, or attempts to alter, vary, modify, or change, the provisions of the said act of 1874, and the constitutional amendment of that year, especially article 208 of the Constitution of the year 1879, and that portion of such Constitution known and distinguished as the ordinance on 'State debt,' do impair the obligation of the contract herein above referred to; that the said parts and portions of such Constitution are, therefore, violative of the Constitution of the United States, and are absolutely null and void, and without the slightest force or effect whatever against complainants; and afford and offer no authority or warrant for the defendants, or any one or more of them, to make such disposition or application of any part or portion of the aforesaid taxes, and the proceeds thereof, collected and to be collected, as to enable the State, therewith, to defray the expenses of the State government, or to accomplish any purpose or purposes other than those prescribed in the aforesaid funding act, and constitutional amendment of 1874; that the defendants, and each of them, may be adjudged and decreed to replace and reinstate to the credit of said interest fund any moneys or funds that may have been diverted therefrom; . . . and that said defendants, and each and every one of them, may be peremptorily enjoined and restrained from recognizing as valid, against your orators, art. 208 of the Constitution of Louisiana," and the " Debt Ordinance," and " from ignoring the Funding Act and constitutional amendment of 1874, and from doing, and causing to be done, any act or thing whatsoever obstructing, preventing, or impeding, or tending, directly or indirectly, to obstruct, prevent, or impede, in the slightest degree, the prompt, full, and complete execution and enforcement of thé act and constitutional amendment aforesaid; and, finally, that the said defendants, and each and every one of them, may be enjoined and restrained to such other and further extent, and in such additional way and manner, as the court may deem right and proper."

On the 26th of January, 1880, the same parties as relators filed a petition in a State court of Louisiana against the auditor and treasurer of state and the several members of the

board of liquidation, being Louis A. Wiltz, the governor, Samuel McEnery, lieutenant-governor, Allen Jumel, auditor, Edward A. Burke, treasurer, William A. Strong, secretary of state, Robert N. Ogden, speaker of the House of Representatives, and the State National Bank of New Orleans, fiscal agent, for a *mandamus* requiring them " to apply and pay to the extinguishment of the interest now due and payable upon the consolidated bonds of the State of Louisiana, or becoming due and payable upon said bonds, and to the redemption and retirement of such consolidated bonds, as are provided for and required by the aforesaid act No. 3 of the year 1874, any and all moneys and proceeds of the tax levied or fixed by said act now in the hands or subject to the control of the said defendants or either one of them, or which have been in the hands or subject to the control of the said defendants or either one of them, or which may come into their hands or become subject to the control of either of them, not already applied to the payment of interest upon the aforesaid bonds, or to the redemption and retirement of the bonds themselves, as provided for and required in and by said act No. 3 ; " and that they " may furthermore be commanded and required to proceed, without delay, to collect the tax fixed or levied in and by the aforesaid act No. 3 of the year 1874, in the manner and to the extent contemplated by that statute, and to apply and pay all moneys realized from such tax to the discharge of the interest and redemption of the bonds issued under and by virtue of the aforesaid Funding Act No. 3 . . . until the principal and interest of such bonds be fully extinguished and discharged ; and, finally, that the said defendants may severally be commanded and required to enforce the act herein above last referred to, and particularly to carry out, perform, and discharge each and every one and all the ministerial acts, things, and duties respectively required of them by the aforesaid act No. 3, according to the full and true intent and purport of that act."

This suit was afterwards removed into the Circuit Court of the United States for the Eastern District of Louisiana.

Upon final hearing the Circuit Court denied the relief prayed for in each of the suits, because, as stated in the conclusions of law which were filed in connection with the findings of fact, it

appeared that the respondents were constitutional officers of the State, and had no relation to the funds collected, or to be collected, except as such officers; that they were clothed with no authority and charged with no duty to pay over or collect said funds to or in behalf of the relators and complainants, but, on the contrary, by the organic law of the State under which their offices were created and exist, the provisions of which constitute their sole mandate, are prohibited from so doing. For these reasons it was concluded that the State was the party which, by its action in its original capacity through the people, had rendered the execution of its contract with the relators impossible through the instrumentality of its officers or functionaries, and that the question presented was political rather than judicial, and could not be adjudicated without calling the State to the bar of the court and subverting its entire financial basis, no matter how unjustly adopted and ordained.

From a judgment and a decree to that effect a writ of error was brought and an appeal taken.

The two suits may properly be considered together here, as they were below, because they present substantially the same questions.

We have no doubt it was the intention of the State of Louisiana to enter into a formal contract with each and every holder of bonds so issued under the act of 1874, to levy and collect an annual tax of five and one-half mills on the dollar of the assessed value of all the real and personal property in the State, and to apply the revenue derived therefrom to the payment of the principal and interest of the bonds, and to no other purpose. By the obligation so entered into it was also agreed, that the tax levied by the act and confirmed by the Constitution should be a continuing annual tax until the bonds, principal and interest, were paid in full; that the appropriation of the revenue derived therefrom should be a continuing annual appropriation, and that no further authority than that contained in the act should be required to enable the taxing officers to levy and collect the tax, or the disbursing officers to pay out the money as collected in discharge of the obligation of the bonds. Whatever may be ordinarily the effect of a promise or a pledge of faith by a State, the language employed in this instance shows

unmistakably a design to make these promises and these pledges so far contracts that their obligation would be protected by the Constitution of the United States against impairment.

It is equally manifest that the object of the State in adopting the " Debt Ordinance " in 1879 was to stop the further levy of the promised tax, and to prevent the disbursing officers from using the revenue from previous levies to pay the interest falling due in January, 1880, as well as the principal and interest maturing thereafter.

The bonds and coupons which the parties to these suits hold have not been reduced to judgment, and there is no way in which the State, in its capacity as an organized political community, can be brought before any court of the State, or of the United States, to answer a suit in the name of these holders to obtain such a judgment. It was expressly decided by the Supreme Court of the State in *State, ex rel. Hart*, v. *Burke*, 33 La. Ann. 498, that such a suit could not be brought in the State courts, and under the Eleventh Amendment of the Constitution no State can be sued in the courts of the United States by a citizen of another State. Neither was there when the bonds were issued, nor is there now, any statute or judicial decision giving the bondholders a remedy in the State courts or elsewhere, either by *mandamus* or injunction, against the State in its political capacity, to compel it to do what it has agreed should be done, but which it refuses to do.

These, then, are suits by creditors at large, of the class provided for in the act of 1874, to compel, by judicial process, the officers of the State to enforce the provisions of the act, when the State, by an amendment to its Constitution, has undertaken to prohibit them from doing so, and when the court, if it requires an officer to proceed, cannot protect him with a judgment to which the State is a party. The persons sued are the executive officers of the State, and they are proceeded against in their official capacity. The money in the treasury is the property of the State, and not in any legal sense the property of the bond or coupon holders. If it be lost or destroyed, the loss will fall alone on the State or its agents, and the bondholders will be entitled to payment in full from other sources. True, the money was raised to pay this particular class of debts,

and the agreement was that it should not be used for any other purpose; but, notwithstanding this, the State has undertaken to appropriate it to defray the expenses of the government. In this way the State has violated its contract, and, if it could be sued, might perhaps be made to set aside its wrongful appropriation of the money already in hand, and raise more by taxation, if necessary.

That the Constitution of 1879 on its face takes away the power of the executive officers to comply with the terms of the act of 1874 cannot be denied. As against everything but the outstanding bonds and coupons, this Constitution is the fundamental law of the State, and it is only invalid so far as it impairs the obligation of the contract on the faith of which the bonds and coupons were taken by their respective holders. The question, then, is whether the contract can be enforced, notwithstanding the Constitution, by coercing the agents and officers of the State, whose authority has been withdrawn in violation of the contract, without the State itself in its political capacity being a party to the proceedings.

The relief asked will require the officers against whom the process is issued to act contrary to the positive orders of the supreme political power of the State, whose creatures they are, and to which they are ultimately responsible in law for what they do. They must use the public money in the treasury and under their official control in one way, when the supreme power has directed them to use it in another, and they must raise more money by taxation when the same power has declared that it shall not be done.

The parties prosecuting the suits do not, in direct terms, ask for the payment of the bonds and coupons they hold. In fact, this seems to have been purposely avoided, for in the suit for *mandamus* the petition was amended before the hearing by striking out all that would have the effect of confining the command of the writ to such a payment, and left the prayer for an order requiring the use of the money raised under the act of 1874 for the redemption and retirement generally of all the bonds and coupons of the issue. In the suit in equity, while it was asked that the " Debt Ordinance " of 1879 might be declared invalid as against the complainants, payment of the

amount due was only sought through the general administration of the finances in accordance with the provisions of the act of 1874. In neither of the suits was any inquiry to be instituted in respect to the particular bonds and coupons held by the plaintiffs, or any special relief afforded as to them. All that is asked will inure as much to the benefit of the other holders of similar obligations as to the particular parties to these suits. So that the remedy sought implies power in the judiciary to compel the State to abide by and perform its contracts for the payment of money, not by rendering and enforcing a judgment in the ordinary form of judicial procedure, but by assuming the control of the administration of the fiscal affairs of the State to the extent that may be necessary to accomplish the end in view.

It is insisted, however, that the money in the treasury collected from the tax levied for the year 1879 constitutes a trust fund of which the individual defendants are *ex officio* trustees, and that they may be enjoined as such trustees from diverting it from the purposes to which it was pledged under the contract. The individual defendants are the several officers of the State, who, under the law, compose the board of liquidation. That board is, in no sense, a custodian of this fund. Its duty was to negotiate the exchange of the new bonds for the old on the terms proposed. It had nothing to do with levying the tax, collecting the money, or paying it out further than by purchasing the bonds with any surplus there might be from time to time in the treasury over what was required to meet the interest. The provision in the law that it shall be the duty of the auditor, treasurer, and the board, respectively, to collect the tax, pay the interest, and redeem the bonds evidently means no more than that the auditor and treasurer shall perform their respective duties under the general laws in the assessment and collection of the tax, and shall pay in the usual manner the interest and principal of the bonds as they respectively fall due, and that the board shall purchase and retire the bonds whenever there is a surplus, which, under the law, is to be used for that purpose.

The treasurer of state is the keeper of the treasury, and in that way is the keeper of the money collected from this tax, just as he is the keeper of other public moneys. The taxes

were collected by the tax-collectors and paid over to him, that is to say, into the State treasury, just as other taxes were when collected. He is no more a trustee of these moneys than he is of all other public moneys. He holds them, but only as the agent of the State. If there is any trust, the State is the trustee, and unless the State can be sued the trustee cannot be enjoined. The officers owe duty to the State alone, and have no contract relations with the bondholders. They can only act as the State directs them to act, and hold as the State allows them to hold. It was never agreed that their relations with the bondholders should be any other than as officers of the State, or that they should have any control over this fund except to keep it like other funds in the treasury and pay it out according to law. They can be moved through the State, but not the State through them.

In this connection there is much that is instructive in *Reg.* v. *Lords Commissioners of the Treasury*, Law Rep. 7 Q. B. 387. There money had been appropriated by Parliament for the payment of costs of a particular character, and an application was made for a *mandamus* to compel the Lords Commissioners of the Treasury to pay certain bills which had been properly taxed; but although the court was emphatic in its declaration that payment ought to be made, the writ was refused because the Lords Commissioners held "the money as the servants of the Crown, and no duty was imposed upon them as between them and the persons to whom the money was payable." Lord Chief Justice Cockburn, in his opinion, said (p. 394): "Though I quite agree that according to the appropriation act they (the Lords Commissioners) were bound to apply the money upon the vouchers being produced, and had no authority to retax these bills, still I cannot say that there is any duty which makes it incumbent upon them to do what I cannot hesitate to say they ought to have done, except as servants of the Crown; because in that character they have received the money, and in no other." And Blackburn, J. (p. 399): "It seems to me that the obligation, such as it is, is upon her Majesty, to be discharged through her servants, and you cannot proceed therefor against the servants." So, here, the obligation is all on the State, to be discharged through its

servants, and the money is held by the officers proceeded against in their character as servants of the State, and no other.

There is nothing in any of the cases in this court that are relied on which, to our minds, authorizes any such relief as is asked. In *Osborn* v. *Bank of the United States*, 9 Wheat. 738, which is the leading case, and cited as authority in all the others, the object was to prevent money which had been unlawfully taken out of the bank by the officers of the State from getting into the treasury. The money was, in legal effect, stopped while passing from the bank to the treasury. The controlling facts are thus stated by Chief Justice Marshall in the opinion (p. 868): "But when we reflect that the defendants, Osborn and Harper, are incontestably liable for the full amount of the money taken out of the bank; that the defendant, Currie, is also responsible for the sum received by him, it having come to his hands with full knowledge of the unlawful means by which it was acquired; that the defendant, Sullivan, is also responsible for the sum specifically delivered to him, with notice that it was the property of the bank, unless the form of having made an entry on the books of the treasury can countervail the fact, that it was, in truth, kept untouched, in a trunk, by itself, as a deposit, to await the event of the pending suit respecting it; we may lay it down as a proposition, safely to be affirmed, that all the defendants in the cause were liable in an action at law for the amount of this decree. If the original injunction was properly awarded, for the reasons stated in the preceding part of this opinion, the money, having reached the hands of all those to whom it afterwards came with notice of that injunction, might be pursued, so long as it remained a distinct deposit, neither mixed with the money of the treasury, nor put into circulation. . . . The money of the bank had been taken, without authority, by some of the defendants, and was detained by the only person who was not an original wrongdoer, in a specific form; so that detinue might have been maintained for it, had it been in the power of the bank to prove the facts which are necessary to establish the identity of the property sued for." Under this state of facts the order for its return involved no question of power to interfere with what was actually in the treasury. The officers stood in the place

of a sheriff who had levied an execution on goods and was sued to test his right to keep them, and the principle applied in the decision is thus stated in the head-note of the report : " A court of equity will interpose by injunction to prevent the transfer of a specific thing which, if transferred, will be irretrievably lost to the owner, such as negotiable stocks and securities." Thus the money seized was kept out of the treasury, because if it got in it would be irretrievably lost to the bank, since the State could not be sued to recover it back. · No one pretended that if the money had been actually paid into the treasury, and had become mixed with the other money there, it could have been got back from the State by a suit against the officers. They would have been individually liable for the unlawful seizure and conversion, but the recovery would be against them individually for the wrongs they had personally done, and could have no effect on the money which was held by the State. Certainly no one would ever suppose that by a proceeding against the officers alone, they could be held as trustees for the bank, and required to set apart from the moneys in the treasury an amount equal to that which had been improperly put there, and hold it for the discharge of the liability which the State incurred by reason of the unlawful exaction.

In *Davis* v. *Gray*, 16 Wall. 203, the receiver of a land-grant railroad obtained an injunction against the Governor and the Commissioner of the General Land-Office of Texas to restrain them from incumbering, by patents to others, lands which had been contracted to the railroad company. The legal title was in the State, but the equitable title in the company. The specific tracts in dispute were, by the contract which had been made, segregated from the public domain and set apart for the company. The case rests on the same principle it would if patents had been actually issued to the company, and the State, through its officers, was attempting to place a cloud on the title by granting subsequent patents to others.

*Board of Liquidation* v. *McComb*, 92 U. S. 531, arose under the same act of 1874 that we are now considering. The board was there enjoined, at the instance of bondholders, from admitting to the privileges of the compromise proposed by the State certain persons other than those originally provided for and on

different terms.    And this clearly because the board was, by
the very terms of the law, charged with the duty of exchanging
the bonds specifically set apart by the contract for a particular·
purpose, and every *bona fide* bondholder, by accepting the com-
promise offered, became personally interested in securing the
due administration of the trust which had thus been committed
to the board.    In fact the board held the new issue of bonds in
trust, and every one who gave up his old obligations and ac-
cepted the new in settlement became a beneficiary under the
trust, and might act accordingly.

In this case, however, there is no such trust.    As has already
been said, the board is charged with no duty in respect to the
taxes, except in connection with the purchase of bonds when-
ever there are funds which can be used in that way.    The au-
ditor and treasurer are required to audit and pay the coupons
as they are presented; but that does not make them trustees
for the bondholders of the money in the treasury out of which
the payment is to be made.    They may draw on the fund
raised to make the payment, but that is the extent of their
official control over it.    The law has never made it a part of
their official duty to separate from the other moneys in the
treasury that realized from the taxes in question, and to hold
it in trust for the bondholders.    The State has contracted not
to use this money in any other way than to pay the debt ; but,
as against the State, the officers have no right to say they will
keep it for that purpose only.    It may be, without doubt,
easily ascertained from the accounts how much of the money
on hand is applicable to the payment of this class of debts ;
but the law nowhere requires the setting apart of this fund any
more than others from the common stock.    In the treasury all
funds are mingled together, and kept so until called for to meet
specific demands.

In *United States* v. *Lee*, 106 U. S. 196, it was held that the
officers of the United States, holding in their official capacity
the possession of lands to which the United States had no title,
could be required to surrender their possession to the rightful
owner even though the United States were not a party to the
judgment under which the eviction was to be had.    Here, how-
ever, the money in question is lawfully the property of the

State.   It is in the manual possession of an officer of the State. The bondholders never owned it.   The most they can claim is that the State ought to use it to pay their coupons, but until so used it is in no sense theirs.

Little need be said with special reference to the suit for *mandamus*.   In this no trust is involved; but the simple question presented is, whether a single bondholder, or a committee of bondholders, can, by the judicial writ of *mandamus*, compel the executive officers of the State to perform generally their several duties under the law.   The relators do not occupy the position of creditors of the State demanding payment from an executive officer charged with the ministerial duty of taking the money from the public treasury and handing it over to them, and, on his refusal, seeking to compel him to perform that specific duty.   What they ask is that the auditor of state, the treasurer of state, and the board of liquidation may be required to enforce the act of 1874, and " carry out, perform, and discharge each and every one of the ministerial acts, things, and duties respectively required of them, . . . according to the full and true intent and purport of that act." Certainly no suit begun in the Circuit Court for such relief would be entertained, for that court can ordinarily grant a writ of *mandamus* only in aid of some existing jurisdiction.  *Bath County* v. *Amy*, 13 Wall. 244; *Davenport* v. *County of Dodge*, 105 U. S. 237.   Our attention has been called to no case in the courts of Louisiana in which such general relief has been afforded ; and the jurisdiction of the Circuit Court was, therefore, in no way enlarged through the operation of the removal acts, even if this is a case which was properly removed, — a question we do not deem it necessary now to decide.   The remedy sought, in order to be complete, would require the court to assume all the executive authority of the State, so far as it related to the enforcement of this law, and to supervise the conduct of all persons charged with any official duty in respect to the levy, collection, and disbursement of the tax in question until the bonds, principal and interest, were paid in full, and that, too, in a proceeding in which the State, as a State, was not and could not be made a party.  It needs no argument to show that the political power cannot be thus

ousted of its jurisdiction and the judiciary set in its place. When a State submits itself, without reservation, to the jurisdiction of a court in a particular case, that jurisdiction may be used to give full effect to what the State has by its act of submission allowed to be done ; and if the law permits coercion of the public officers to enforce any judgment that may be rendered, then such coercion may be employed for that purpose. But this is very far from authorizing the courts, when a State cannot be sued, to set up its jurisdiction over the officers in charge of the public moneys, so as to control them as against the political power in their administration of the finances of the State.    In our opinion, to grant the relief asked for in either of these cases would be to exercise such a power.

*Judgment affirmed.*
*Decree affirmed.*

Mr. Justice Field and Mr. Justice Harlan dissented.

Mr. Justice Field.    I am not able to concur in the judgment in these cases, and I will briefly state my reasons.

I admit that the rule of the common law that the sovereign cannot be held amenable to process in his own courts without his consent, is applied in this country to the State, under which designation are included the people within its territorial limits, in whom resides whatever sovereignty the State possesses. But they act and speak in this country, at least in times of peace, only through the Constitution and laws.    For their will we must look to these manifestations of it.    If in that way they consent to suits, either directly against themselves by name or against any of their authorized agents, there can be no reasons of policy or of law against issuing process in proper cases to bring them or their agents before the court.    And if in that way, that is, by their Constitution or laws, they direct their officers to do or omit certain things, in the doing or omission of which individuals are interested, and they provide appropriate remedies to compel or enjoin the performance of those things, there can be no reason why such remedies should not be resorted to when private rights are involved.

And such is the case with respect to the subjects of the

present suits.  The State of Louisiana entered into certain engagements with her creditors; she embodied them in the most solemn form in a statute and in her organic law; she provided for the levying of a tax to pay those creditors; she prescribed certain duties for designated officers to perform in its collection and disbursement; she made it a felony for those officers to divert the fund thus raised to other purposes; she declared that no further legislation should be necessary for the collection of the tax or the appropriation of the proceeds, and that for the collection and payment of the tax the judicial power of the State should be exercised when necessary.  The plaintiffs in these suits seek the enforcement of these engagements; and they are resisted merely because the engagements are repudiated by the State; and this court holds that it has no power to stay the repudiation.

That the character and object of these suits may more clearly appear, I will briefly give the history of the action of the State.  Prior to 1874 Louisiana had contracted an indebtedness amounting to about eighteen millions of dollars.  She asserted that a large portion of it had been fraudulently contracted; while the holders contended that their claims were valid and that she was legally and equitably bound therefor. Under these circumstances, and with a view to determine the conflicting claims of the parties, and to liquidate and settle her indebtedness, she proposed to issue new bonds for sixty per cent of the alleged indebtedness, upon the surrender of the claims; and, to induce the surrender, offered to make various enactments to secure the principal and interest of the new bonds.  In 1874 she passed an act, known as act No. 3 of the laws of that year, entitled " An Act to provide for funding obligations of the State by exchange for bonds; to provide for principal and interest of said bonds; to establish a board of liquidation; to authorize certain judicial proceedings against it; to define and punish violations of this act; to prohibit certain officers diverting funds, except as provided by law, and to punish violations therefor; to levy a continuing tax and provide a continuing appropriation for said bonds; to make a contract between the State and holders of said bonds; to prohibit injunctions in certain cases; to limit the indebtedness of the

State and to limit State taxes; to annul certain grants of State aid; to prohibit the modification, novation, or extension of any contract heretofore made for State aid; to provide for the receipt of certain warrants for certain taxes; and to repeal all conflicting laws."

By this act the governor, lieutenant-governor, auditor, treasurer, secretary of state, and speaker of the House of Representatives, and a seventh person to be selected by them, called a fiscal agent, were constituted a board of liquidation, and were authorized to issue bonds of the State, to be called consolidation bonds, payable in forty years, with interest at seven per cent, and to exchange them for valid outstanding bonds and auditor's warrants at the rate of sixty cents on the dollar. The interest was to be payable semi-annually, on the first of January and July of each year; and for it coupons were to be annexed to the bonds.

The act levied an annual tax of five and a half mills on the dollar of the assessed value of all real and personal property in the State, and declared that it should be collected for the purpose of paying the principal and interest of the consolidated bonds, and that the revenue derived therefrom was thereby " set apart and appropriated for that purpose, and no other," and that it should be a felony for the fiscal agent or any officer of the State or of the board of liquidation to divert the fund from its legitimate channel. It also declared that this tax, which is called an interest tax, " shall be a continuing annual tax until the said consolidated bonds shall be paid or redeemed, principal and interest; and the said appropriation shall be a continuing annual appropriation during the same period, and this levy and appropriation shall authorize and make it the duty of the auditor and treasurer, and the said board respectively, to collect said tax annually, and pay said interest and redeem the said bonds until the same shall be fully discharged."

One section also provided " that any judge, tax-collector, or any officer of the State obstructing the execution of this act, or any part of it, or failing to perform his official duty thereunder, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by imprisonment not exceeding five years and by fine not exceeding two thousand dollars, at the discretion of the court."

Another section enacted that each provision of the act should be, and it was declared to be, " a contract between the State of Louisiana and each and every holder of the bonds " issued under the act.

But, as though this act was not of itself a sufficient assurance of the unalterable purpose of the State to fulfil the promise it contained, an amendment to her Constitution was proposed and adopted, of which the following is the first section : —

" The issue of consolidated bonds, authorized by the General Assembly of the State, at its regular session in the year 1874, is hereby declared to create a valid contract between the State and each and every holder of said bonds, which the State shall by no means and in no wise impair. The said bonds shall be a valid obligation of the State in favor of any holder thereof, and no court shall enjoin the payment of the principal or interest thereof, or the levy and collection of the tax therefor ; to secure such levy, collection, and payment, the judicial power shall be exercised when necessary.   The tax required for the payment of the principal and interest of said bonds shall be assessed and collected each and every year, until the bonds shall be paid, principal and interest, and the proceeds shall be paid by the treasurer of the State to the holders of said bonds, as the principal and interest of the same shall fall due, and no further legislation or appropriation shall be requisite for the said assessment and collection, and for such payment from the treasury."

It would puzzle the wit of man to find anywhere in the legislation of the world a more perfect assurance of the fixed purpose of a State to keep faith with her creditors, or of a pledge of a portion of her revenues for their payment, or of the submission of her officers to the compulsory process of the judicial tribunals, if necessary, to carry out her engagements. With the knowledge that the Federal Constitution ordains " that no State shall pass any law impairing the obligation of contracts," Louisiana proclaims that each provision of the act shall be and is thereby declared to be a contract between her and each and every holder of the bonds issued under the act. And the constitutional amendment reiterates substantially the same thing by declaring that the issue of the consolidated bonds

created a valid contract between the State and each and every holder of said bonds, " which the State shall by no means and in no wise impair."

Under this act and the constitutional amendment, obligations of the State amounting to over $12,000,000 were surrendered, and bonds taken for sixty per cent of their amount, which are held all over the country. The complainants in the injunction suit, and the petitioners for the *mandamus*, hold for themselves and others, whom they represent, $900,000 of the bonds. The interest on them has not been paid, and yet a portion of the tax levied to meet such interest has been collected, and is now in the hands of the treasurer of the State, one of the board of liquidation. The amount is admitted to be about $300,000, and as collections were making when this admission was given, there is now probably a much larger amount in his hands. In both suits it is alleged that the treasurer and other officers of the State intend to use the funds thus collected for other purposes than the payment of the interest. In one of them an injunction is asked against such a perversion of the funds. In the other a *mandamus* is asked to compel the application of the funds to the payment of the interest, and also the collection of the taxes authorized by the act of 1874, and the constitutional amendment of that year, to meet further interest as it shall become due.

Why should not both these prayers be granted?

The only answer offered is, that in 1879 Louisiana adopted a new Constitution, which reduced the interest on the consolidated bonds to two per cent per annum for five years, to three per cent for fifteen years afterwards, and to four per cent thereafter, with a proviso that the holders of the bonds might take new bonds for seventy-five per cent on the dollar, drawing four per cent interest.

The new Constitution also directed that the coupon of the consolidated bonds falling due Jan. 1, 1880, should be remitted, and that the interest taxes collected for its payment should be transferred to defray the expenses of the State government. The change in the rate of interest and the remission of the coupon falling due Jan. 1, 1880, were made

without the consent of the bondholders, or any consultation with them. Of course the new Constitution, in these provisions, is a repudiation of the engagements of the act of 1874 and of the constitutional amendment of that year, and is a direct violation of the inhibition of the Federal Constitution against the impairment of the obligation of contracts.

Is this inhibition against the repudiation by the State of her engagements of any efficacy? The majority of the court answer No. I answer, adhering to the doctrines taught by a long line of illustrious judges preceding me, " Yes, it is; " and though now denied, I feel confident that at no distant day its power will be reasserted and maintained. In that faith I dissent from the judgment of my associates, and I shall continue to do so on all proper occasions, until the prohibition inserted in the Constitution as a barrier against the agrarian and despoiling spirit, which both precedes and follows a breach of public faith, is restored to its original vigor.

The question whether the court will restrain the diversion of the funds in the hands of the treasurer, a member of the board of liquidation, is to be considered precisely as though the new Constitution had never been adopted. The inhibition of the Federal Constitution is upon the State and not merely upon her legislature. All the authority which her people can confer, whether by constitutional enactment or legislative provision, is subject to the inhibition. Her people are at all times under the Constitution of the United States, subject to its restrictions as they are entitled to its privileges. They cannot lawfully insert in any constitution or organic law provisions contravening that instrument. They cannot authorize their legislature to pass a bill of attainder, or an *ex post facto* law, or a law impairing the obligation of contracts, nor can they embody in their Constitution clauses amounting to or operating as such enactments. Any such authority or clauses would be treated as nugatory and futile by all tribunals holding that the Constitution of the United States is, what on its face it is declared to be, the supreme law of the land. Therefore, the new Constitution of Louisiana stands before us, with respect to her past contracts, with no greater weight than would a legislative enactment containing similar provisions; and what the State

authorizes to be done by her judicial tribunals against her officers, in the collection of the tax and the application of the moneys raised for the payment of the interest on the bonds, can be done by the judicial tribunals of the Federal government when a case is transferred to them from a State court.

If the new Constitution had never been adopted, there could be no question as to the power of the State courts to require that the moneys collected be applied to the payment of the interest. It would not only have been the duty of the board of liquidation to thus apply them, but it would have been a felony to refuse to do so. Now, whatever enactment, constitutional or legislative, impairs the obligation of the contract with the bondholders, that is, abrogates or lessens the means of its enforcement, is void. Therefore, the new Constitution, as to that contract, is to be treated as though it never existed. As said by this court, without a dissenting voice, only two years ago, in *Wolff* v. *New Orleans:* "Legislation producing this latter result (impairment of the obligation of a contract by abrogating or lessening the means of its enforcement), not indirectly as a consequence of legitimate measures taken, as will sometimes happen, but directly by operating upon those means, is prohibited by the Constitution, and must be disregarded, treated as though never enacted, by all courts recognizing the Constitution as the paramount law of the land." 103 U. S. 358, 365.

And again, in the same case : " The prohibition of the Constitution against the passage of laws impairing the obligation of contracts applies to the contracts of the State, and to those of its agents acting under its authority, as well as to contracts between individuals. And that obligation is impaired, in the sense of the Constitution, when the means by which a contract at the time of its execution could be enforced, that is, by which the parties could be *obliged* to perform it, are rendered less efficacious by legislation operating directly upon those means." Id. 367.

No reason in law, therefore, any more than in morals, can be given why the mandates of the act of 1874 and the constitutional amendment of that year should not be carried out. There is nothing in the fact that the defendants are officers of

the State.   The books are full of cases where executive and administrative officers of a State have been required by the judiciary to do certain acts, or been enjoined from doing them. And it has not been deemed an answer to the proceeding that the State was interested in the controversy.

In *Osborn* v. *Bank of the United States*, decided in 1824, an injunction was sustained against the treasurer and auditor of Ohio to prevent the seizure of moneys belonging to the bank in payment of taxes levied under an unconstitutional law of the State.   It was urged with much zeal that the State of Ohio, though not nominally a defendant, was the real party in interest, and that the suit was in fact against the State, which it was conceded could not be sued directly.   But the court said, Chief Justice Marshall delivering the opinion : " If the State of Ohio could have been made a party defendant, it can scarcely be denied that this would be a strong case for an injunction. The objection is that as the real party cannot be brought before the court, a suit cannot be sustained against the agents of that party ; and cases have been cited to show that a court of chancery will not make a decree unless all those who are substantially interested be made parties to the suit.   This is certainly true where it is in the power of the plaintiff to make them parties, but if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best-established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong which they would afford against him could his principal be joined in the suit."   9 Wheat. 738, 842.

These views, as was said in the opinion in *United States* v. *Lee*, 106 U. S. 196, have never been overruled ; and the case itself is cited with approval in *Davis* v. *Gray*, decided in 1872, as establishing, among other propositions, that " Where the State is concerned, the State should be made a party, if it could be done.   That it cannot be done is a sufficient reason for the omission to do it, and the court may proceed to decree against the officers of the State in all respects as if the State were a party to the record.   In deciding who are parties to the suit,

the court will not look beyond the record. Making a State officer a party does not make the State a party, although her law may have prompted his action, and the State may stand behind him as the real party in interest." 16 Wall. 203, 220.

In *Davis* v. *Gray*, the Governor and the Commissioner of the General Land-Office of Texas were " enjoined from issuing or causing or permitting to issue " patents of certain lands, the sale of which her Constitution had authorized, upon the supposition that the title of a corporation to them had been lost. In considering the right of a private party to maintain suit against those officers, inasmuch as a suit could not be brought directly against the State, the court reasserted the doctrine announced in *Osborn* v. *Bank of the United States.*

The objection suggested was also considered and disposed of in *Board of Liquidation* v. *McComb*, a case against these very officers, decided in 1875. There the board undertook to liquidate a debt contracted in reconstructing and keeping in repair levees on the Mississippi River, with consolidated bonds issued under the act of 1874, pursuant to the authority of a subsequent statute of the legislature. A citizen of Delaware holding some of the consolidated bonds contended that the levee debt was not one of the debts to fund which these bonds had been issued, and that the use of them for that purpose would defeat one of the benefits of the funding scheme. He therefore applied to the Circuit Court of the United States for an injunction to restrain the board from funding the levee debt with those bonds, and obtained it. The injunction was made perpetual by a final decree, which was affirmed here. " In our judgment, therefore," we said, speaking by Mr. Justice Bradley, " the court below was right in granting the injunction as to the consolidated bonds, if the defendants, occupying the official position they do, are amenable to such a process. On this branch of the subject, the numerous and well-considered cases heretofore decided by this court leave little to be said. The objections to proceeding against State officers by *mandamus* or injunction are, first, that it is in effect proceeding against the State itself; and, secondly, that it interferes with the official discretion vested in the officers. It is conceded that neither of these things can be done. A State, without its

consent, cannot be sued by an individual; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter. But it has been well settled that when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it. In such cases, the writs of *mandamus* and injunction are somewhat correlative to each other. In either case, if the officer plead the authority of an unconstitutional law for the non-performance or violation of his duty, it will not prevent the issuing of the writ. An unconstitutional law will be treated by the courts as null and void." 92 U. S. 531, 541.

Nor is there any force in the objection that the funds which the complainants and petitioners seek to reach are in the treasury of the State. They are appropriated by the law of 1874, and by the constitutional amendment of that year, to the payment of the interest on the consolidated bonds. The statute declares that the revenue derived from the taxes levied to pay the interest and principal of the bonds is "set apart and appropriated to that purpose, and no other;" that "the said appropriation shall be a continuing annual appropriation" until the bonds are paid or redeemed, principal and interest; and that "it shall be deemed a felony for the fiscal agent, or any officer of the State or board of liquidation to divert the fund" from this channel. The constitutional amendment declares that no further legislation than that specified therein shall be requisite for the appropriation of the proceeds of the taxes levied.

Nothing more could be expressed to render the appropriation of the fund for the interest and principal of the bonds absolutely complete. The fund could not afterwards be diverted to any other purpose. The ministerial duty alone remained with the officer of the State having charge of the fund, wherever it might be, to apply it.

There would seem to be an impression that to constitute a valid appropriation there must be some segregation of the amount appropriated from the general mass of money in the treasury, by which it is placed in packages, bags, or boxes, separate from the rest and set aside.  But nothing of the kind is done, nor is it required to take the amount appropriated from the control of the fiscal officers of the State for other purposes.  The appropriation is the legalization of the use of a designated amount in the treasury for a specific object, and an inhibition of its use in any other way.  That is all.  Henceforth to meet the appropriation the fiscal officers must retain the designated amount in the treasury, but not necessarily separated in packages, bags, or boxes from other funds.  Their duty is purely ministerial, — to hold it and pay it when called for.  Were this not so, there could be no appropriations of moneys before their collection, which it is the constant practice of legislative bodies to make in view of anticipated revenue.  When the moneys are collected and passed into the treasury, the appropriation is complete.  They are, in the eye of the law, dedicated to a specific purpose, and the party in whose behalf the appropriation is made can compel its payment by *mandamus*, as in the case of appropriations for the salaries of judges, heads of departments, and others.  That writ is the common and appropriate remedy to enforce such payment.

Nor is there any weight in the objection that the officers of the State are called upon to enforce the collection of the tax.  They are simply called upon to obey the mandates of the law and Constitution of the State.  Both levy the tax, and designate its amount and the officers to collect it.  The statute declares that the tax shall be a " continuing annual tax " until the bonds are paid or redeemed.  The constitutional amendment declares that " the tax required for the payment of the principal and interest of said bonds shall be assessed and collected each and every year until the bonds shall be paid, principal and interest, and the proceeds shall be paid by the treasurer of the State to the holders of said bonds, as the principal and interest of the same shall fall due, and no further legislation or appropriation shall be requisite for the

said assessment and collection, and for such payment from the treasury."

Here are provisions for levying, collecting, and appropriating, sufficient for these purposes, or language is incapable of expressing them. Whatever doubts might be entertained as to the authority of the legislature to make a levy and an appropriation to take effect in subsequent years, to meet the interest then accruing, they are removed by the constitutional amendment. There is nothing in the reason of the thing why the levy of taxes and the appropriations for all purposes should be made annually. They may be made for years in advance, if the Constitution of the State so permits, in order to provide for a sinking fund or to meet an expenditure for a work which may take years for its completion, or to meet, as in this case, future interest on its indebtedness. In some of the States the sessions of the legislature are biennial. The interval between the sessions might be increased, and there would be quite as much objection, so far as power is concerned, to the levy of taxes, and to the appropriations for those periods as for one year.

The tax provided and the appropriation of its proceeds were made for many years by the amendment to the Constitution, which expressed at the time the will of the people of the State. Nothing is to be done by the court and nothing is asked of it but to require that this will be obeyed.

There is another reason suggested against the maintenance of the suits, not, as appears to me, very potential, but which affects the judgment of some able men, — that the obligations of States are purely honorary, and cannot, therefore, be the subject of judicial cognizance. What is meant by honorary, so far as I can understand it, is that the obligations may or may not be fulfilled as the States will; in other words, that they are matters of convenience and not of duty, to be performed if the caprice of the hour approve, to be disregarded if the caprice of a subsequent hour disapprove. Or, to use other terms of explanation, as there is no mode of compelling a State, by suit directly against her, to observe her obligations, they must be deemed honorary; that is, just so far as they may be dishonored without redress to those who trusted

to her good faith, they are to be deemed honorary obliga-
tions.

Whatever merit this suggestion may possess, it can have no
place for consideration here. When a State enters into the
markets of the world as a borrower, she, for the time, lays aside
her sovereignty and becomes responsible as a civil corporation,
And although suits against her even then may not be allowed,
her officers can be compelled to do what she then contracts
that they shall do. And as to these consolidated bonds, Louis-
iana has declared in her organic law that they created a valid
contract between her and each and every holder, which she
" shall by no means and in no wise impair," and that no court
" shall enjoin the payment of the principal or interest thereof,
or the levy and collection of the tax therefor," but that to secure
them her judicial power shall be exercised when necessary.
These engagements are not imperfect obligations, mere hono-
rary promises, which she can keep or break without accounta-
bility.

If a State can successively repudiate her solemn obligations,
can obtain the surrender of a large portion of the demands of
her creditors upon pledges for the more prompt payment of the
remainder, and then set aside as worthless the pledges given
with no possibility of redress to the creditors, either by enforce-
ment of the pledges, or by a return of the surrendered demands,
what confidence can be reposed anywhere? Public faith will
be the synonym of public dishonesty; and, as I stated on a
former occasion: " If the government will not keep its faith,
little better can be expected from the citizen. If contracts are
not observed, no property will in the end be respected; and all
history shows that rights of persons are unsafe when property
is insecure. Protection to one goes with protection to the other,
and there can be neither prosperity nor progress where this
foundation of all just government is unsettled." *Sinking Fund
Cases*, 99 U. S. 700, 767.

On the argument much weight was placed upon the decision
of the Supreme Court of Louisiana in *State, ex rel. Hart*, v.
*Burke*, 33 La. Ann. 498; and it is cited as authority to the
point that no remedy by *mandamus* exists in the courts of the
State to compel her officers to carry out her engagements; stated,

however, in the opinion as deciding that there is no remedy by *mandamus* or injunction against the State in its political capacity, a proposition which no one controverts. The case was similar in its character and objects to those now under consideration. And it was there held that the courts of Louisiana have no jurisdiction to entertain any judicial proceeding, the object of which is to enforce the performance of a contract or obligation of the State against her will; that they have no authority to declare that a provision of her Constitution does not express her will; and that they cannot annul a provision of that Constitution on the ground that it impairs the obligation of a contract with the State, because such a contract can never become the subject of judicial enforcement against her will. In these conclusions the court gave no force to the constitutional inhibition as against the State. It would seem as though it was of opinion that, in all matters of contract, the inhibition applies only to legislative action. It says: " We have been referred to authorities to the effect that where an officer pleads the authority of an unconstitutional law as a justification for the non-performance or violation of his duty, this will not prevent the issue of the writ. 9 Wheat. 859; 16 Wall. 220. This may be so when the authority invoked is a statute under the State Constitution; but it is different when the authority is an article in the Constitution itself." And the court proceeds to lay down the doctrine that clauses of the State Constitution, though violative of the Constitution of the United States, express the will of the State, and as such must be respected by her courts. In thus holding, the court would seem to have lost sight of two provisions of the Federal Constitution, one, which declares that " this Constitution and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; " and the other, which declares that " the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." These provisions, which govern in Louisiana as well as in other States, being overlooked, and the inhibition against the impairment of the obligation of contracts being limited to legislative action only on the part of the State, so far as concerns her own contracts, it is not sur-

prising that the court held that the ordinance of repudiation and shame embodied in the new Constitution was to be obeyed; that its conflict with the Federal Constitution was to be disregarded, and that what the State was prohibited from doing should be deemed the legal expression of her will, and enforced as such. The decision rests upon the theory that a proceeding against the officers of the State to compel them to do their duty is a suit against the State; and that her consent to a suit against them has been withdrawn by clauses of the new Constitution. But if those clauses never lawfully became a part of the new Constitution, — because the State under the Federal Constitution was incapable of enacting them, — then her consent remains, and the present suits are simply attempts to compel-her officers to do her lawful bidding. The State cannot speak through an enactment which contravenes the Federal Constitution.

There can be no doubt that, but for the Debt Ordinance in the Constitution of 1879, a *mandamus* or other compulsory process could have been issued by the courts of Louisiana to compel officers of the State, and of the board of liquidation, to execute the provisions of the act of 1874 and of the constitutional amendment of that year. The Code of Procedure of the State declares that the object of the writ " is to prevent a denial of justice or the consequence of defective police, and it should, therefore, be issued in all cases where the law has assigned no relief by the ordinary means, and where justice and reason require that some mode should exist of redressing a wrong or an abuse of any nature whatever, " sect. 830; and that " it may be directed to public officers to compel them to fulfil any of the duties attached to their office, or which may be legally required of them." Sect. 834. These provisions are sufficiently comprehensive to embrace the present cases, and authorize compulsory process against the defendants to enforce the performance of the duties with which they are charged under the act and constitutional amendment of 1874.

But independently of them, the constitutional amendment of 1874 of itself invests the courts of the State with jurisdiction to issue such process, by the clause which declares that, to secure the levy, collection, and payment stipulated, " the judicial

power shall be exercised when necessary," and that means such power as properly belongs to judicial tribunals, to enforce the performance by public officers of duties imposed upon them by law.

In *Marbury* v. *Madison*, 1 Cranch, 137, the conditions under which the writ will be issued are stated as clearly and happily as anywhere in the reports; and though the case is familiar to all, some of the observations of the great Chief Justice, who there spoke for the court, may properly be repeated. The plaintiff there, as is well known, had been appointed a justice of the peace for the District of Columbia; his commission was signed by the President and sealed by the Secretary of State, but its delivery was refused by a new secretary succeeding to the one who had signed the commission. The court held that the plaintiff was entitled to his commission, and to withhold it was an act not warranted by law, but in violation of a vested right, and then proceeded to consider whether the laws of the country gave him a legal remedy. " The very essence of civil liberty," said Chief Justice Marshall, " certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the King himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court " And again: " The government of the United States has been emphatically termed a government of laws and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right. If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case." He then shows that there was nothing in the character of the case or the nature of the transaction which exempted it from legal investigation or prevented the injured party from having redress; and, among other instances, he referred to the act of Congress of 1794, concerning invalids, as one where the performance of duties imposed upon the heads of departments might be enforced. " By the act concerning invalids, passed in June, 1794," he said, " the Secretary of War is ordered to place on the pension list all persons whose names are contained

in a report previously made by him to Congress. If he should refuse to do so, would the wounded veteran be without remedy? Is it to be contended that when the law in precise terms directs the performance of an act, in which an individual is interested, the law is incapable of securing obedience to its mandate? Is it on account of the character of the person against whom the complaint is made? Is it to be contended that the heads of departments are not amenable to the laws of their country? Whatever the practice on particular occasions may be, the theory of this principle will certainly never be maintained. No act of the legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law." And again: " If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law. How, then, can this office exempt him from this particular mode of deciding on the legality of his conduct, if the case be such a case as would, were any other individual the party complained of, authorize the process? It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a *mandamus* is to be determined."

If the act be one which involves discretion, the officer only conforms to the law in exercising that discretion. If it be one which calls for the consideration of evidence and the exercise of judgment, he must be left free to act upon his own conclusions. If, however, the act does not rest in his discretion; if it does not call for the exercise of judgment, but is a specific duty, imposed by law, and ministerial in its character, such as the delivery of a commission, the issue of a patent, the drawing of a warrant, or the payment of moneys appropriated (the subject to which the appropriation is made not calling for the exercise of judgment in its selection), and individuals have a direct pecuniary interest in the performance of that duty, — the officer is as much subject to the compulsory process of the judicial tribunals as a private citizen. If it were not so, our government would cease to be a government of laws, and the

obloquy to which Marshall refers would be cast on the jurisprudence of the country.

It is not, then, the office of the defendants which can preclude an inquiry into the propriety of calling upon the courts to enforce the performance of duties imposed by law upon them. The propriety of issuing the writ must be determined by the nature of the act to be done; whether it is one which they, under the law, are required to do.

No interference is sought with the general financial affairs of the State. These she may manage as she chooses. What is sought is an injunction to prevent her officers from diverting to other purposes funds collected for the payment of her creditors, and a direction to them to proceed and carry out her command as to the collection hereafter of the specific tax levied by herself, and the disbursement of its proceeds. The fact that she subsequently made an unconstitutional attempt to rescind that command cannot affect its character or efficacy.

In *Woodruff* v. *Trapnall*, 10 How. 190, decided in 1850, this court enforced a contract of the State of Arkansas in a proceeding by *mandamus* against one of her officers, compelling him to receive certain bills in satisfaction of a judgment recovered by the State, in the face of a subsequent statute prohibiting their receipt.

In *Hartman* v. *Greenhow*, 102 U. S. 672, decided only two years since, this court, with but a single dissenting voice, enforced a contract of the State of Virginia in a proceeding by *mandamus* against one of her officers, compelling him to receive coupons of certain bonds for taxes, pursuant to the law under which the bonds were issued, although a subsequent law of the State had forbidden their receipt. And the Supreme Court of Appeals of Virginia has, in similar cases, after mature consideration, asserted a like authority over officers of the State, never apparently imagining that the sovereignty of the Commonwealth was at all assailed by judicial process compelling them to do their duty. The Commonwealth has required no reminder from a Federal tribunal to awaken her attention to the invasion of any of her rights of sovereignty.

A number of other cases in this court and in the Circuit Courts might be cited to the same purport; and if the law re-

specting contracts with States, and rights of property acquired
from States, is not to be subject to continual change, that law
should remain undisturbed, having been recognized as sound for
more than a third of a century.   The doctrine of *stare decisis*
is deemed of great importance on questions affecting private
rights.    Much more ought it to be respected and resolutely ad-
hered to in determinations touching the limits of the powers
of the Federal and State governments, and the authority of
each over the contracts of States with individuals.

Nor can I perceive in what way the law, as thus pronounced,
encroaches here upon any of the powers of the State.   It is
undoubtedly a matter of great importance, indeed of absolute
necessity to wise government in this country, that there should
be no interference with the rights of the States in the manage-
ment of their local affairs, including in these the collection and
disbursement of their revenues.   But if a State contracts to do
certain things, and in order that they may be performed sub-
jects her officers to the control of the courts, and makes their
refusal to carry out her pledges a felony, it cannot be justly
contended that her reserved rights are at all invaded if her
officers are judicially commanded to do what she says they
shall do.   No doctrine is here asserted in conflict with the
exercise of any rightful authority of the State.   All that is
claimed is simply a right to compel her officers to obey her own
enactments, such as were constitutionally passed, and thus be-
came laws, and to disregard such as she had no power to pass.
If the State is above the Constitution of the United States; if
the protection of that instrument does not extend to her en-
gagements with individuals; if her power is as absolute as that
of the Parliament of England; if the theory of the Federal
Constitution, that it binds States as well as individuals, is un-
sound; if it is not, as it declares itself to be, the supreme
law of the land, — then my position falls; but otherwise
there is no answer to it — at least none that I have been able
to see.

MR. JUSTICE HARLAN.   Having a deep conviction that the
opinion of the court is in conflict with the spirit and tenor of
our former decisions, subversive of long-established doctrines,

and dangerous to the national supremacy as defined and limited by the Constitution, I deem it my duty to dissent from it.

That the bonds and coupons issued by Louisiana, in pursuance of the statute and constitutional amendment of 1874, are contracts within the meaning of that clause of the Federal Constitution which declares that no State shall pass any law impairing the obligation of contracts; that the provisions in its new Constitution known as the " Debt Ordinance " of 1879 were intended to impair, and, if enforced, do impair, the obligation of those contracts; and that such ordinance is therefore a nullity as against the bondholders who do not accept its terms, — are propositions so manifestly correct as not to require argument in their support. Indeed, I understand the court, substantially, to concede them to be sound. As the Constitution of the United States is the supreme law of the land, " anything in the Constitution or laws of any State to the contrary notwithstanding," I had supposed that all State action, whether by legislative enactment or constitutional provision, must be disregarded when in conflict with that law. Yet this court holds that it cannot enforce or restrain the agents of a State from destroying the obligation of her contract with a citizen because such relief will require them, in the discharge of their official duties, to disobey the orders of what is denominated the *supreme political power* of that State. The court, it seems to me, in effect, adjudges that the defendants cannot be coerced by the courts of the Union to disregard nullifying enactments of their State, although such coercion, if employed, would only be for the purpose of enforcing the rightful authority of the Constitution. It appears upon the very face of these proceedings, and is not to be disguised, that those officers refuse to perform purely ministerial duties solely because the will of the State is, with them, paramount, and to be obeyed although thereby they destroy rights guaranteed by the supreme law of the land.

To state the proposition in another form: Here are contract rights which, but for the nullifying provisions in the new Constitution of Louisiana, the courts (as I will presently show) would unquestionably protect by the process of injunction, and also, if need be, by *mandamus* compelling the offi-

cers of the State to discharge plain official duties which re-
quire in their performance no exercise of discretion.    Now,
however, it is determined — if I do not misapprehend the de-
cision — that the judicial arm of the nation is hopelessly para-
lyzed in the presence of an ordinance, destructive of those
rights, and passed in admitted violation of the Constitution of
the United States.    A State — which " cannot be viewed as a
single, unconnected, sovereign power," but is a member of the
Union under a Constitution whose supremacy all must ac-
knowledge — assumes to release its officers from the duty of
obeying important provisions of that Constitution ; and this
court, it would seem, holds that, in cases like these, it has no
power, as against such hostile State action, to require those offi-
cers to respect private rights guaranteed by such provisions.

1. What are the terms of the admitted contract between
Louisiana and the holders of the consolidated bonds ?

By the statute of 1874 a fixed annual tax is levied for the
purpose of paying the principal and interest of the bonds au-
thorized to be issued; the revenue therefrom is thereby " set
apart and appropriated to that purpose and no other ; " it is
made a felony for any officer to divert it from that purpose ;
the interest tax is declared to be a continuing annual tax until
the bonds, principal and interest, are paid or redeemed ; the
appropriation is made a continuing annual one during the same
period ; and the levy and appropriation, it is declared, shall au-
thorize and make it the duty of the auditor and treasurer, and
the board of liquidation, respectively, to annually collect the
tax, pay the interest, and redeem the bonds, until they are fully
discharged.

Each provision of the act is declared to be a contract be-
tween the State and each holder of the bonds ; it is made a
misdemeanor for any judge, tax-collector, or other officer to ob-
struct the execution of any part of it, or to fail to perform his
official duty ; tax-collectors are inhibited from paying over
moneys so collected to any other person than the State treas-
urer ; and it is provided that no court or judge of the State
shall have power to enjoin the payment of principal or interest
of the bonds or the collection of the special tax therefor.

These provisions were embodied in the Constitution of Lou-

isiana, by an amendment adopted in 1874; and with a view of facilitating the sale of the bonds, provided for in the act of that year, it declares that such issue creates "a valid contract between the State and each and every holder of said bonds, which the State shall by no means and in no wise impair;" that "no court shall enjoin the payment of the principal or interest thereof or the levy and collection of the taxes therefor;" that "to secure such levy, collection, and payment, the judicial power shall be exercised when necessary;" that the tax required for the payment of the principal and interest of such bonds "shall be assessed and collected each and every year until the bonds shall be paid, principal and interest, and the proceeds paid by the treasurer of the State to the holders of said bonds, as the principal and interest of the same shall fall due; and, lastly, "that no further legislation or appropriation shall be requisite for the said assessment and collection, and for such payment from the treasury."

With these statutory and constitutional provisions in force, the State issued bonds to the amount of about $12,000,000, and taxes were assessed, collected, and paid over to the State treasurer solely for the purpose of meeting their interest. Of the amount collected to pay coupons maturing Jan. 1, 1880, about $300,000 are in the State treasury. The State officers refuse to apply the money for that purpose or to take any steps toward further collections as enjoined by the statute and Constitution of 1874.

2. What has the State done that impairs the obligation of her contracts?

By her Debt Ordinance the coupons falling due the 1st of January, 1880, are "remitted" without the consent of creditors, and the interest tax already collected is therein directed to be used exclusively for the payment of the expenses of the State government. Unless the holders of consolidated bonds are paid out of this money, raised for their benefit exclusively, and unless future collections are made as required by the contract, they will be wholly without remedy, and their bonds will cease to have any value. Plainly that ordinance is a breach of the plighted faith of the State. The financial world, as we have seen, was assured by legislative enactment and constitutional

provision that what the State officers now propose to do should never be done; that those who took the bonds might rely upon a fixed annual levy to meet the principal and interest; that all money thereby raised should be applied exclusively to that purpose; and that not only the officers of the State should assess, collect, and pay as it stipulated, but that the power of the judiciary should be exercised, whenever necessary, to enforce the obligation of the contract. These laws, in their substantial provisions, are as binding on the State, and are as much a part of the contract, as if those provisions had been therein expressly set forth. *Bronson* v. *Kinzie,* 1 How. 311; *McCracken* v. *Hayward,* 2 id. 608; *Planters' Bank* v. *Sharp,* 6 id. 301; *Walker* v. *Whitehead,* 16 Wall. 314; *Edwards* v. *Kearzey,* 96 U. S. 595; *Louisiana* v. *New Orleans,* 102 id. 203.

The State has no more right by law to impair the obligation of its contracts than it has, by law, to impair the obligation of contracts between individuals. In *State of New Jersey* v. *Wilson,* the language of the court, speaking by Chief Justice Marshall, is : " In the case of *Fletcher* v. *Peck* it was decided in this court, on solemn argument and with much deliberation, that this provision of the Constitution [the contract clause] extends to contracts to which a State is a party, as well as to contracts between individuals." 7 Cranch, 164, 166. It is the settled doctrine of this court that contracts with States are as fully protected by the Constitution against impairment by State legislation as contracts between individuals. *Green* v. *Biddle,* 8 Wheat. 1; *Providence Bank* v. *Billings,* 4 Pet. 514; *Woodruff* v. *Trapnall,* 10 How. 190; *Wolff* v. *New Orleans,* 103 U. S. 358.

3. If the Debt Ordinance of Louisiana is in violation of the Constitution of the United States, and, therefore, a nullity as against the holders of consolidated bonds, — if the latter are entitled by the terms of their contract to be paid out of the moneys collected for their benefit and to have further collections made, — is there any mode, known to the law, by which their rights can be protected? My brethren of the majority answer this question in the negative when they adjudge that no relief whatever can be given in either of these suits. One is a suit in equity commenced in the Circuit Court of the

United States by holders of consolidated bonds to prevent, by injunction, officers of the State from using the proceeds of taxes already raised under the statute and Constitution of 1874, for any purpose other than that for which they were collected and paid to the State treasurer. In the other suit, the plaintiffs, holders of consolidated bonds, and citizens of New York, ask a *mandamus* against the State officers compelling the application of the moneys so collected to the payment of their coupons, and also the collection of taxes to meet future interest as it becomes due.

Some comment is made upon the extended nature of the relief asked by plaintiffs. It is sufficient to remark that the court is never bound to give relief to the full extent demanded; and all relief is not to be denied because more is asked than the court will grant under any circumstances, or in the particular case. And there is no ground, I submit, for the suggestion that granting relief would require the administration, by the court, of the general finances of the State. What should be done, if properly it may be, is, by necessary orders, to prevent the officers of the State from depriving creditors of moneys which by express contract have been set apart and appropriated exclusively to the payment of their claims. There is no obstacle to the payment out of that fund, except the prohibition in the void Debt Ordinance of 1879. It is distinctly admitted to be easily ascertainable from the accounts how much of the money in the treasury is applicable to this class of debts. Indeed, it appears from the opinion in *Newman* v. *Burke*, hereafter referred to, that the treasurer and fiscal agent of Louisiana held within their control, when these suits were commenced, all the moneys raised under the statute and Constitution of 1874 to meet the interest falling due Jan. 1, 1880. They have, in their hands, more than enough to pay the coupons of Jan. 1, 1880, held by the parties now before the court. Further,— a fact most significant in view of the suggestion that these moneys are mingled with other moneys in the State treasury, — the interest fund created to pay coupons maturing Jan. 1, 1880, were, by an act of the General Assembly of Louisiana, approved Jan. 4, 1882, directed to be invested in United States bonds. Acts La. 1881, p. 50. And it is not pre-

tended that payment from that fund will produce the slightest confusion in the treasurer's accounts, or involve the use of moneys raised for other and distinct purposes. If any confusion ensues from such an application of these moneys, it would be only of that kind which arises when the law prevents a repudiating debtor from misappropriating funds, in his hands, that have been dedicated to a specific purpose.

It is apparently urged, as an obstacle in the way of relief, that plaintiffs do not seek to have the proceeds of these taxes applied specially to the payment of their claims, but ask such orders as will enable all holders of consolidated bonds to participate in the distribution of the moneys raised under the statute and Constitution of 1874. Had the suit for a *mandamus* sought the application of the moneys solely to the payment of coupons held by the plaintiffs, it might, perhaps, have been urged as ground for its refusal, that each bondholder had an interest in the fund so created. *State, ex rel. Boyer*, v. *State Treasurer*, 32 La. Ann. 177. If the relief asked cannot be given for the benefit of all holders of consolidated bonds, there would seem to be no difficulty in restricting payments to such as are actually before the court in person or by representation. It is, however, proper to say that, notwithstanding the criticisms made by the court upon the nature and extent of the relief asked, I do not feel authorized to infer from its opinion that relief would be given to the parties before it, had they asked payment only of their coupons. The opinion seems to proceed upon the broad ground that, as Louisiana is not directly suable in its corporate capacity, the courts of the Union cannot reach its agents employed, under its orders, in the work of destroying the contract rights of the plaintiffs.

4. Are these suits forbidden by the Eleventh Amendment of the Federal Constitution, which declares that the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State? I understand the court, in effect, if not in terms, to hold that they cannot be maintained without violating that amendment.

The first authority cited in support of that view is *Reg.* v. *Lords Commissioners of the Treasury*, Law Rep. 7 Q. B. 387.

It appears that by an act of Parliament a round sum was appropriated to the Crown to be used in paying costs incurred in prosecutions at assizes and quarter sessions in England, formerly paid out of county rates. Bills of costs having been passed by local officers, certain items were disallowed and others reduced by the Lords of the Treasury. Subsequently a rule went against the latter to show cause why a writ of *mandamus* should not issue compelling them to pay these bills out of the funds appropriated to the Crown for such purposes. The judges, although of opinion that the defendants should be governed by the taxation of the local officers, declined to grant the writ. Cockburn, C. J., said: " The question comes to be, whether the Lords Commissioners of the Treasury, when this money gets into their hands, are bound to apply it as servants of the Crown, or as the servants of Parliament who vote the money." Blackburn, J., said: " The question remains, whether there is any statutable obligation cast upon the Lords of the Treasury to do what we are asked to compel them to do by *mandamus*, namely, to issue a minute to pay that money; because it seems to me clear that we have a right to grant a *mandamus* if there is such a statutory obligation, particularly when the application is made on behalf of persons who have a direct interest in the matter." Similar declarations were made by the other judges. They all concurred in denying the writ upon the ground that the money was voted, not to named officers to be by them applied to a designated purpose, but as " a supply to the Crown;" that the officers who distributed it for the purposes named acted as servants of the Crown, not as servants of Parliament; that a suit against those officers was, therefore, one against the sovereign, whom, said Chief Justice Cockburn, the Court of Queen's Bench had no power, even in appearance, to command.

It seems to me that case furnishes no support for the suggestion that these are suits against the State, simply because they are brought against its officers. It does not conflict with the proposition that the State treasurer can be compelled to apply the proceeds of these taxes as stipulated in the statute and Constitution of 1874, which were his sole authority to receive them. Here there *is a statutable* obligation upon him to

pay the coupons as they matured. And to that is added the obligation imposed by that Constitution, which, in terms, declares that the proceeds of taxes collected under the act of that year " shall be paid by the treasurer of the State to the holders of said bonds, as the principal and interest of the same shall fall due," without further legislative authority. These obligations remain upon that officer, unless it be that the Debt Ordinance, although unconstitutional and void, has discharged them. Had Parliament, instead of the act involved in the case cited, passed one directly imposing upon the defendants the duty of paying out of moneys appropriated for that purpose a certain class of claims, it is manifest that the Court of Queen's Bench would have compelled them, by *mandamus* or other process, to perform that duty. In the case supposed there would have been a statutable obligation which the court would not have permitted the defendants to evade on the pretext that they were officers of the Crown.

This distinction is well illustrated in *Grenville-Murray* v. *Earl of Clarendon*, Law Rep. 9 Eq. 11. There the plaintiff sought a decree for the value of diplomatic services alleged to have been rendered by him. He claimed that he was entitled to be paid out of certain money voted by Parliament to the Foreign Office. Lord Romilly, M. R., said : " It [the money so voted] is not paid in trust for any particular person. The case that was cited was to this effect : that if Parliament votes a sum of £1,000 to *John Smith*, and the treasury devote in their books the payment of that sum to other purposes, then a *mandamus* will lie to the treasury in order to pay that £1,000 to *John Smith*. But there is nothing of the sort here. Parliament has merely voted certain sums to her Majesty, and of these sums £600,000 are to be applied to the Foreign Office. The distribution of that amount is left to the officers of the Foreign Office to apply in such a manner as is most subservient to her Majesty's service and to the due support of the Foreign Office, and there is nothing whatever to connect the plaintiff with a penny of this money in any aspect. It is impossible for me, therefore, in that state of things, to say that there is any trust for him."

I refer also to *Rex* v. *Lords Commissioners of the Treas-*

*ury,* 4 Ad. & El. 286.    That was an application for a *mandamus* against the defendants, who had authority by statute to grant a certain "superannuation allowance."    Sir J. Campbell, attorney-general, contended that it was against principle that the court should order a *mandamus* in the name of the King, directing the King to pay money.    But the *mandamus* was granted.    Lord Denman, C. J., said: "If, then, this is only the case of public officers having the control of a sum of money for this particular purpose, there is no reason that a *mandamus* should not issue.    They are officers under the Crown ; but the Crown has no more to do with them for this purpose than any other officers.    They are merely parties who have received a sum of money as trustees for an individual under the provisions of an act of Parliament. . . . Here it only appears that a sum of money has been voted as an allowance to an individual, which sum they have, and refuse to pay."

There is another consideration which strengthens this position, that is, the supremacy of the Constitution of the United States over State constitutions and State laws.    To the duty imposed by the statute and Constitution of 1874 upon its officers there is superadded the duty imposed by the fundamental law of the land not to regard as binding any State enactment which impairs the obligation of contracts.

If the case cited from the Queen's Bench were susceptible of the construction put upon it by this court, it should not have controlling influence.    Here no such relations exist between the executive and judicial departments as exist in England between the Crown and the courts.    This was shown in the elaborate opinion of Mr. Justice Miller, speaking for the court in *United States* v. *Lee,* 106 U. S. 196.    That was ejectment to recover real estate, in the actual possession of officers who claimed it, not in any personal right, but for the United States, — property used and occupied as a cemetery for dead soldiers of the Union.    It was contended that a suit against the officers, having for its object to disturb their possession, was a suit against the government.    In support of that position numerous cases were cited from the English courts, which held that a suit could not be maintained against officers of the Crown.    But we held that upon such a question

but little weight should be given to those adjudications; that there is a vast difference in the essential character of the two governments in reference to the source and depositaries of power; that while in England the Crown, the fountain of honor, cannot be disturbed in its possession of property by process directed against its officers or agents, "under our system the people, who are there subjects, are sovereign;" that "their rights, whether collective or individual, are not bound to give way to a sentiment of loyalty to the person of the monarch;" that "the citizen here knows no person, however near to those in power, or however powerful in himself, to whom he need yield the rights which the law secures to him when it is well administered;" that, "when he, in one of the courts of competent jurisdiction, has established his right of property, there is no reason why deference to any person, natural or artificial, not even the United States, should prevent him from using the means which the law gives him for the protection and enforcement of that right." Said the court further, in that case: "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. It is the only supreme power in our system of government, and every man who, by accepting office, participates in its functions, is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."

In that case the court reaffirms the doctrines of *Osborn* v. *Bank of the United States*, 9 Wheat. 738. The latter was a suit to recover moneys, which officers of the State of Ohio, in conformity with its statutes, had illegally taken from a bank of the United States. The suit being against the officers of the State, the objection was taken that it could not be sustained without the State itself being a party; that the State could not be sued; consequently, it was argued, the relief prayed — the restoration of the money — could not be granted. But to that objection the court, speaking by Chief Justice Marshall, — and this language is quoted ap-

provingly in *United States* v. *Lee*, — said: " If the State of Ohio could have been made a party defendant, it can scarcely be denied that this would be a strong case for an injunction. The objection is, that as the real party cannot be brought before the court, a suit cannot be sustained against the agents of that party; and cases have been cited to show that a court of chancery will not make a decree unless all those who are substantially interested be made parties to the suit. This is certainly true where it is in the power of the plaintiff to make them parties; but if the person who is the' real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best-established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong, which they would afford against him could his principal be joined in the suit."

The decision in that case has not been heretofore questioned in this court. It seems to establish, upon grounds which cannot well be shaken, that a suit against State officers, to prevent a threatened wrong to the injury of the citizen, is not necessarily a suit against the State within the meaning of the Eleventh Amendment of the Constitution; for, said Chief Justice Marshall, " the Eleventh Amendment, which restrains the jurisdiction granted by the Constitution over suits against States, is, of necessity, limited to those suits in which a State is a party to the record." Here, the State is not a party to the record. Here, officers of Louisiana only are parties defendants; and the relief asked is that they be required to perform purely ministerial duties imposed upon them by the statute and Constitution of 1874, whose provisions, as respects the matters now in issue, are still in force and obligatory, because never affected, modified, or repealed, otherwise than by a debt ordinance, subsequently adopted, conceded to be in conflict with the Constitution, and, therefore, absolutely void.

There are other decisions of this court still more directly in point. The leading one is *Davis* v. *Gray*, 16 Wall. 203. In that case it appears that the State of Texas made a grant of

lands to a railroad company, upon the basis of which bonds were issued known as land-grant mortgage bonds. They were sold in large numbers in this country and Europe. Subsequently the State, by provisions of its statutes and Constitution, attempted to repudiate and nullify its contract; and, in pursuance thereof, its officers proposed to issue patents to others for a part of the lands embraced in this grant. Thereupon a suit in equity was instituted in the Circuit Court of the United States against the Governor and the Commissioner of the General Land-Office of Texas, to prevent them from issuing patents for the lands or any part of them. The State was, of course, not made a party on the record. The bill was demurred to upon the ground that she could not be sued, and that the suit, being against her officers, was one, within the meaning of the Constitution, against her. The demurrer was overruled, and the relief asked was given.

Touching the question of jurisdiction, the court, speaking by Mr. Justice Swayne, stated these principles as having been announced in *Osborn* v. *Bank of the United States*. 1. A Circuit Court of the United States, in a proper case in equity, may enjoin a State officer from executing a State law in conflict with the Constitution, or a statute of the United States, when such execution will violate the rights of the complainant. 2. Where the State is concerned, the State should be made a party, if it could be done. That it cannot be done is a sufficient reason for the omission to do it, and the court may proceed to decree against the officers of the State in all respects as if the State were a party to the record. 3. In deciding who are parties to the suit, the court will not look beyond the record. Making a State officer a party does not make the State a party, although her laws prompt his action, and the State stands behind him as the real party in interest. p. 220. It was in conformity with those doctrines that the relief asked was given. See also *Vattier* v. *Hinde*, 7 Pet. 252; *Louisville Railroad Co.* v. *Letson*, 2 How. 497; 2 Story's Const., sect. 1685; 1 Kent, Com. 351.

In part upon the authority of *Davis* v. *Gray* and *Osborn* v. *Bank of the United States*, this court, in *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541, maintained the right of a holder

of consolidated bonds to a decree against the officers of the State of Louisiana, who are here defendants, constituting the board of liquidation, preventing the use of such bonds for the payment of a debt due from the State to a levee company. The proposed action of the board was based upon a statute passed March 2, 1875. So that the suit had for its object to prevent State officers, charged with the execution of the latter act, from carrying out its provisions. It never occurred to this court that the suit was, for that reason, one against the State within the meaning of the Constitution. Upon the general question, whether the defendants, being officers of the State, were amenable to process from a Federal court, Mr. Justice Bradley, speaking for this court, observed: " On this branch of the subject the numerous and well-considered cases heretofore decided by this court leave little to be said. The objections to proceeding against State officers by *mandamus* or injunction are : first, that it is, in effect, proceeding against the State itself; and, secondly, that it interferes with the official discretion vested in the officers. It is conceded that neither of these things can be done. A State, without its consent, cannot be sued by an individual ; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter. But it has been well settled, that when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance ; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it. In such case, the writs of *mandamus* and injunction are somewhat correlative to each other. In either case, if the officer plead the authority of an unconstitutional law for the non-performance or violation of his duty, it will not prevent the issuing of the writ. An unconstitutional law will be treated by the courts as null and void." Upon these grounds, the decree of the Circuit Court was affirmed, so far as it prohibited the debt due the levee company from being funded in consolidated bonds. Such use of them was

deemed an impairment of the contract rights of those who were entitled to receive them.

It seems to me impossible, in view of our decision in that case, apart from previous decisions upon which it was founded, to hold that these suits are forbidden by the Eleventh Amendment of the Federal Constitution. We have adjudged that there is power in the courts of the Union, in a suit by an individual against State officers, to prevent them — in execution of an unconstitutional statute — from using these consolidated bonds for purposes inconsistent with the contract under which they were issued. In these cases, it is determined that those courts are powerless, in suits against such officers, to prevent the misapplication of moneys collected for the purpose of meeting the interest on those bonds; and this, in part, upon the ground that the relief asked will require the officers, who have charge of those moneys, to disregard the confessedly void orders of the supreme political power of the State.

It may be asked, When before has this court found the unconstitutional mandate of a State to be an obstacle in the way of compelling her officers to respect rights of contract, the obligation of which is protected against impairment by any law of the State? Of what value is the contract clause of the Federal Constitution if it cannot be enforced against hostile provisions of a State Constitution? This court said, in *Dodge* v. *Woolsey*, 18 How. 331, 360, that "a change of constitution cannot release a State from contracts made under a constitution which permits them to be made;" in *Jefferson Branch Bank* v. *Skelly*, 1 Black, 436, 448, that a contract between Ohio and a bank in that State "was entitled to the protection of the Constitution of the United States against any law of Ohio impairing its obligation;" in *Railroad Company* v. *McClure*, 10 Wall. 511, 515, that "the Constitution of a State is undoubtedly a law," within the meaning of the contract clause of the Constitution, and that "a State can no more do what is thus forbidden by one than by the other, — there is the same impediment in the way of both;" in *White* v. *Hart*, 13 id. 646, 652, that "it is well settled by the adjudications of this court that a State can no more impair the obligation of a contract by adopting a constitution than by passing a law, — in the eye of the constitu-

tional inhibition they are substantially the same thing;" and in *Gunn* v. *Barry*, 15 Wall. 610, 623, that the Constitution of the United States " is above and beyond the power of Congress and the States, and is alike obligatory upon both ; a State can no more impair an existing contract by a constitutional provision than by a legislative act; both are within the prohibition of the National Constitution." Why should these established doctrines of the court be overruled, as, for all practical purposes, they are, by the judgment this day rendered ? The Constitution declares that it shall be the supreme law of the land, " anything in the Constitution or laws of any State to the contrary notwithstanding." Its mandate, in that respect, is addressed alike to the judges of the Federal and State courts, for it declares that " the judges in every State shall be bound thereby." And, as is said in *Dodge* v. *Woolsey*, " to make its supremacy more complete, impressive, and practical, that there should be no escape from its operation, and that its binding force upon the States and the members of Congress should be unmistakable, it is declared that " the senators and representatives, before mentioned, and the members of the several State legislatures, and all executive and judicial officers, both of the United States and of the several States, shall be bound by oath or affirmation to support this Constitution."

Nor, if the relief here asked be granted, can I agree that the officers of the State cannot be protected against her subsequent action. If proceeded against because of their compliance with the judgments of the courts of the Union, the suit can ultimately be brought here for review, where no one will be permitted to suffer because of his obedience to the supreme law of the land.

Upon the general question of the power of the Circuit Court to grant a *mandamus* against State officers, there are some propositions announced by the court which should be examined. The fact is mentioned that the coupons held by plaintiffs have not been reduced to judgment, and it is said that the Circuit Court, in exercising its original jurisdiction, can ordinarily grant a writ of *mandamus* only in aid of some existing jurisdiction. As the State cannot be sued as a party defendant, to say that a judgment for the amount of the coupons is a condition prece-

dent to a *mandamus* is only another form of saying that there is no remedy whatever to prevent the misapplication of the moneys raised under the contract and by virtue of the statute and Constitution of 1874. The demands of the plaintiffs are not disputed, except upon the ground that the Debt Ordinance has assumed, without the consent of the State's creditors, to remit the interest falling due Jan. 1, 1880, and to divert the funds raised to meet it. The genuineness of the bonds and coupons is not questioned. The case, therefore, comes within the rule, explicitly laid down in McComb's and other cases, that *mandamus* will lie to compel the performance by a public officer of a plain ministerial duty, requiring no exercise of discretion. Such a remedy is absolutely essential for the protection of the rights here claimed.

Upon this question, reference is made by the court to *Bath County* v. *Amy*, 13 Wall. 244, and *Davenport* v. *County of Dodge*, 105 U. S. 237. In the first of those cases it was decided that the Circuit Court had no power, under the act of 1789, to issue a writ of *mandamus* except where necessary or ancillary to the exercise of its jurisdiction. And that doctrine was reaffirmed in *Davenport* v. *County of Dodge*, upon the authority of *Bath County* v. *Amy*, but without any question being raised in the former case as to the power of the Circuit Court to issue writs of *mandamus* since the passage of the act of March 3, 1875, c. 137. It will be found that the decision in *Bath County* v. *Amy* was based upon *McIntire* v. *Wood*, 7 Cranch, 504; *McClung* v. *Silliman*, 6 Wheat. 598; and *Kendall* v. *United States*, 12 Pet. 524.

In *McIntire* v. *Wood*, the Circuit Court was held to have authority to issue such writs only when necessary to the exercise of its jurisdiction. But it was said: "Had the 11th section of the Judiciary Act [the one declaring what suits shall be within the original cognizance of Circuit Courts] covered the whole ground of the Constitution, there would be much reason for exercising this power in many cases wherein some ministerial act is necessary to the completion of an individual right arising under the laws of the United States, and the 14th section of the same act would sanction the issuing of the writ for such a purpose. But although the judicial power of the

United States extends to cases arising under the laws of the
United States, the legislature have not thought proper to
delegate the exercise of that power to its Circuit Courts ex-
cept in certain specified cases."

In *Kendall* v. *United States*, the previous cases were held to
decide that the writ was appropriate to compel the perform-
ance of a ministerial act, necessary to the completion of an
individual right arising under the laws of the United States.
In all the cases prior to *Bath County* v. *Amy*, the want of
power in the Circuit Court to issue the writ, in the first in-
stance, and in advance of a judgment, establishing the rights
of the parties, was put distinctly upon the ground that the
whole judicial power of the United States had not been dele-
gated to the Circuit Courts.    In Kendall's case, however, the
power of the Circuit Court in the District of Columbia, to
compel the Postmaster-General by *mandamus* to perform a
duty enjoined by an act of Congress, was sustained because,
differently from the Circuit Courts in the several States, its
jurisdiction then extended to all cases in law or equity arising
under the laws of the United States.    Now, it is apparent that
the act of. March 3, 1875, c. 137, supplies what in *McIntire* v.
*Wood* and *McClung* v. *Silliman* was said to be wanting.    It
substantially " covers the whole ground of the Constitution."
It invests the Circuit Courts with original jurisdiction, and
with jurisdiction by removal from the State courts, of all suits
at law or in equity, where the matter in dispute exceeds,
exclusive of costs, the sum or value of $500, arising under the
Constitution or laws of the United States, or treaties made, or
which shall be made, under their authority ; or in which the
United States are plaintiffs or petitioners ; or in which there is
a controversy between citizens of different States ; or a contro-
versy between citizens of a State and foreign States, citizens, or
subjects ; or a controversy between citizens of the same State
claiming lands under grants of different States.

It seems to me entirely clear that since the act of March 3,
1875, c. 137, enlarged the jurisdiction of the Circuit Courts,
they have power, in. the first instance, and in advance of a
judgment to issue a *mandamus*, to compel the performance of
purely ministerial acts, which require no exercise of discretion,

and are necessary to the protection or completion of an individual right arising under the Constitution or the laws of the United States. Unless the Circuit Court can, by injunction, prevent the State officers from doing what they propose to do, and, by *mandamus*, compel them to perform the ministerial acts enjoined by the statute and Constitution of 1874, then its new and enlarged jurisdiction is of no practical value in any case where a State determines to repudiate its contracts and to enforce ordinances impairing their obligation. The power has always existed in those courts to issue such writs, not specifically provided by statute, as " may be necessary for the exer cise of their respective jurisdictions, and agreeable to the usages and principles of law." 1 Stat. 81, 334; Rev. Stat., sect. 716. Jurisdiction to hear and determine a suit arising under the Constitution and laws of the United States carries with it the power to issue either a *mandamus* or an injunction, or both, when essential to the protection and enforcement of the rights involved. In such cases the writ is, in every legal sense, not simply necessary, but vital to the exercise of the jurisdiction granted.

It must also be observed that the *mandamus* suit was commenced in an inferior court of the State, and thence removed into the Circuit Court of the United States. If the power of the latter depended upon the question whether the State court could, by *mandamus*, compel a State officer to perform plain official duties imposed by law, the writ should be awarded. This court, I submit with great confidence, is in error if it means to say that *State, ex rel. Hart*, v. *Burke*, 33 La. Ann. 498, decides, or that the Supreme Court of Louisiana has ever decided, that the courts of that State cannot, under any circumstances, compel her officers, by *mandamus*, to perform plain official duties requiring no discretion. The State Code of Procedure expressly declares that the writ " may be directed to public officers to compel them to fulfil any of the duties attached to their office, or which may be legally required of them." Sect. 834. It is, I think, clear that but for the Debt Ordinance the court would have sustained the writ in that case, and compelled the officers to obey the statute and Constitution of 1874. What the court adjudged was that while an

officer could not plead the authority of an unconstitutional statute as a justification for the non-performance or the violation of his duty, it was different where the authority is an article in the State Constitution.   Upon that ground alone the writ was refused.

That I do not misinterpret that case is clear from *Newman* v. *Burke*, determined in April, 1882.   Newman, holding warrants on the general fund of the State for 1880 and 1881, claimed that by virtue of the Debt Ordinance he was entitled to be paid out of moneys in the hands of State officers, collected under the statute and Constitution of 1874, and by that ordinance directed to be transferred to the general fund. He obtained by the judgment of the Supreme Court of the State an order for a *mandamus* against the State treasurer and fiscal agent, directing them to conform their books to the requirements of the Debt Ordinance, subject, however, to the right and duty of those officers " to retain *in statu quo* so much of the fund in controversy as may be necessary to satisfy the pending claims of S. J. Hart and John Elliott *et al.*, . . . in case judgment should be rendered in their favor in the judicial proceedings instituted by them, and now pending in the Supreme Court of the United States."   Thus, it seems that those officers, with the approval of the Supreme Court of Louisiana, only await the final determination of these suits to ascertain whether they will be permitted to execute a State ordinance in conflict with the Federal Constitution.

The State court, affirming the doctrines of *State, ex rel. Hart,* v. *Burke,* said : " Inasmuch as no court can ever acquire jurisdiction over a State, or to enforce a contract of a State against her will, it follows that no court can ever have power to decree the invalidity of any provision of the State Constitution on the ground that it impairs the obligation of such a contract.   But unless the court may decree the nullity of such a provision, on such a ground, it follows that it cannot compel the officers of the State to do anything in violation thereof, because the Constitution of the State is their exclusive mandate and absolutely binding on them."

This language needs no interpretation.   While the Federal Constitution declares that it shall be the supreme law of the

land, anything in the Constitution of any State to the contrary notwithstanding, the Supreme Court of Louisiana holds that, in the matter of State contracts, her Constitution is the exclusive mandate to her officers, and absolutely binding upon them, anything in the Constitution of the United States to the contrary notwithstanding. And I take leave to say, with all respect for my brethren, that the decision this day rendered can be sustained upon no other ground than that taken by the State court. But in vain has this court repeatedly adjudged that a suit against the officers of a State to enforce the performance of plain official duties is not, necessarily, one against the State within the meaning of that Constitution; in vain has it often decided that contracts with States are as fully protected by that Constitution as are those between individuals, and that a State can no more impair an existing contract by constitutional provision than by legislative act; in vain have the Circuit Courts of the United States been invested with jurisdiction of all suits arising under the Constitution and laws of the United States; in vain does that Constitution declare that it shall be the supreme law of the land, binding upon the judges in every State, — if it be true, as determined by the Supreme Court of Louisiana, that no court can ever have power either to decree a provision of a State Constitution invalid on the ground that it impairs the obligation of contracts with that State, or to compel State officers to disregard such invalid provision.

As further evidence that the State court recognizes the right to a *mandamus* compelling State officers to discharge ministerial duties, imposed by provisions of the Debt Ordinance, I refer to *State, ex rel. Ecuyer,* v. *Burke,* 33 La. Ann. 969. Ecuyer was the owner of certain consolidated bonds, issued under the act of 1874. He concluded to accept the provisions of the Debt Ordinance of 1879, and, in conformity therewith, applied to the State treasurer to have his bonds stamped, so as to show that he acceded to the reduction of interest made by that ordinance. That officer declining to comply with this request, an application was made to an inferior State court to compel him to stamp them. His refusal to comply with the relator's demands was based in part upon a statute passed in 1880 (after the debt

ordinance went into operation), which declares that no bond shall be stamped until the coupon of January, 1880, is surrendered. That the relator did not do. A *mandamus* was refused; but the Supreme Court, after deciding that the act of 1880 was inoperative, because in conflict with the Debt Ordinance, said: " In his answer, defendant alleges that the service required of him by relator is not a ministerial duty, and that the judiciary has no control over the executive and co-ordinate branches of the government, except as regards purely ministerial duties of executive officers. As regards the first proposition, we decide that the service required in this case is the performance of a purely ministerial duty, and this is too plain to require argument. As to the second proposition, it is elementary ; but while fully recognizing the independence and all the rights of the co-ordinate branches of the government, it is only necessary to say that it is the province and duty of the judiciary, whenever the question is properly brought before it in judicial proceedings, to decide whether duties sought to be enforced at the hands of officers are or are not ministerial, and that it is of the essence of the judiciary to adjudge such questions, as otherwise those officers would themselves, by their own decision, be judges of their legal and constitutional powers." The judgment of the lower court was reversed, and the *mandamus* ordered to be issued, at the costs of the State treasurer in both courts.

Thus it is shown that the same court which determined *State, ex rel. Hart*, v. *Burke* has decided that the courts of Louisiana have power, by *mandamus*, to compel an officer of the State to discharge ministerial duties, requiring in their performance no discretion upon his part; especially when necessary to enforce a provision in the State Constitution in conflict with the Constitution of the United States.

It would seem, then, that holders of the consolidated bonds of Louisiana are in this anomalous condition: While her courts, because of the Debt Ordinance in the new Constitution, will not, by *mandamus*, compel her officers to perform the purely ministerial duties imposed by the statute and Constitution of 1874, but will, by using that writ, require those officers to execute the provisions of that ordinance, although it is confessedly in conflict with the Federal Constitution, the courts of the

United States, though now invested with jurisdiction of all suits arising under the Constitution and the laws of the United States, are, according to the present decision, without power to compel those officers to respect the inhibition in the supreme law of the land against State laws impairing the obligation of contracts. Such are the results which follow from the action of the "supreme political power" of a State whose officers, sworn to support the Constitution of the United States, are required by the State court, and now permitted by this court, to regard the State Constitution as their "exclusive mandate and absolutely binding on them."

My own conclusions are : —

That the officers of Louisiana cannot rightfully execute provisions of its Constitution which conflict with the supreme law of the land, and the courts of the Union should not permit them to do so ;

That but for the adoption of the unconstitutional Debt Ordinance of 1879, and whether the suits were in a State court or in the Circuit Court of the United States, these State officers would have been restrained by injunction from diverting the funds collected to meet the interest on the consolidated bonds, and would have been compelled, by *mandamus*, to perform the purely ministerial duties enjoined by the statute and Constitution of 1874 ;

That if by existing laws the Circuit Court of the United States has no power to issue such writs, still, upon the removal of the *mandamus* suit from the State court, the former had power to do what the State court could legally have done had there been no removal, viz., make peremptory the alternative *mandamus* granted at the beginning of the suit by the inferior State court ;

That the Debt Ordinance, being void because in conflict with the Constitution of the United States, furnishes no reason whatever — least of all in the courts of the Union — why the relief asked should not be granted by any court of proper jurisdiction as to parties ;

That to refuse relief because of the command of a State to its officers to do that which is forbidden, and refrain from doing that which is enjoined, by the supreme law of the land ; or to

give effect, for any purpose, in the courts of the Union, to the orders of the supreme political power of a State, made in defiance of the Constitution of the United States, is, practically, to announce that, so far as judicial action is concerned, a State may, by nullifying provisions in its fundamental law, destroy rights of contract, the obligation of which the Constitution declares shall not be impaired by any State law. To such a doctrine I can never give my assent.

I am, therefore, unable to concur in the opinion and judgment of the court.