State ex rel. Board of Liquidation vs. State Treasurer.

and in such cases it has been held that the verdict must find the defendant guilty, then add the punishment—that the latter without the former would be inadequate.

These decisions must obviously rest upon the principle that the court is not authorized or justified to "reason" to an inferred verdict of guilty against the accused (see Bishop on Criminal Procedure, Third Edition, Sec. 1012 and notes thereunder).

The finding of the jury of the guilt of the prisoner must be direct and positive.

The State claims that "the polling of the jury had the effect of curing the imperfections of the verdict," and State vs. Smith, 33 An. 1416, and State vs. Ross, 32 An. 855, are relied upon in support of this contention, but an examination of the manner in which in this case the jury was polled, will show that the situation was not varied or altered for the better by that fact.

For the reasons herein assigned it is hereby ordered, adjudged and decreed, that the judgment appealed from be and the same is hereby affirmed.

---

## No. 11,357.

### STATE EX REL. BOARD OF LIQUIDATION VS. JOHN PICKETT, STATE TREASURER.

1. Act 3 of 1874; Act 58 of 1877, regular session, and Act 77 of 1877, extra session, were not repealed by the adoption of the Constitution of 1879, and the Debt Ordinance thereto appended.

2. The constitutional amendment of 1874 embodies the purport and substance of the legislative enactment of that year, and declares that the tax required for the payment of the principal and interest of the bonds shall be assessed and collected every year, until the bonds shall be paid, principal and interest; and the debt ordinance declares that there shall be levied an annual tax sufficient for the full payment of the interest on the bonds.

3. There is no essential difference in the phraseology of the two constitutional enactments.

4. The legislative enactments of 1877 provide that any surplus that may remain after the payment of interest coupons shall be deposited with the fiscal agent at credit of a specific and distinct fund, to be called and known as the Redemption of the Public Debt Fund, and shall be used exclusively, under directions of the board of liquidation, for the retirement and sinking of the consolidated bonds and past due coupons.

5. The act of 1877, extra session, makes it the duty of the treasurer to keep separate accounts of the income and expenditures of each year; and, after setting apart or paying out an amount thereof equal to the appropriations and warrants lawfully made against each of said funds, the surplus, if any remain, shall be immediately deposited by the treasurer at the credit of the Redemption of the Public Debt Fund.

3. The debt ordinance deals exclusively with the *interest* and not the *principal* of the bonds, leaving the latter in *statu quo;* and the fact that the bondholders were given an *option* to surrender their holdings and recover other bonds in exchange, on the terms proposed therein, did not impair their force or validity.

7. All statutes enacted since the adoption of the debt ordinance of 1879 must be construed in conformity therewith.

In point of fact all subsequent statutes deal with an existing fund—an interest tax surplus—already collected under existing laws, and, at most, same could only lead to the supposition that the laws of 1874 and 1877 were not operative; and had it been intended by the Legislature to repeal any of said laws, same would have been nugatory and void.

APPEAL from the Civil District Court, Parish of Orleans. *Ellis, J.*

*M. J. Cunningham*, Attorney General, for the Relator and Appellee.

Respondent *in propria persona.*

The opinion of the court was delivered by

WATKINS, J.   The Board of Liquidation represents that from the funds set aside from year to year—that is to say, from 1880 to 1882 —to pay the interest on the consolidated bonds of the State, there has accumulated a surplus in said interest fund exceeding *$400,000.* That, under the provisions of Act 3 of 1874 and Act 58 of 1877, it is the duty of the Board of Liquidation to have such surplus invested in bonds and coupons attached, by purchasing same at public auction from the lowest bidder, after due advertisement, and under the conditions and with the restrictions imposed by law.

The further averment of the board is that said surplus interest fund has been segregated from the funds and revenues of the State, and dedicated and consecrated to the bonded debt, and duly and legally appropriated to be employed by said board for the purpose of buying bonds and coupons, as aforesaid.

That said board has passed a resolution directing advertisements for bids, as it was its plain duty to do.

That, under the act of 1877, and other laws of the State, it is the plain ministerial duty of the State treasurer to pay for all bonds so redeemed and retired or bought under the direction of the board on the order of the board; but that, notwithstanding his said duty, said

treasurer has refused to pay and declared that he will not pay for said bonds, upon the order of the board or on the warrant of the auditor; and said board believes it would be a vain and useless thing to advertise for bids in the face of such declaration and refusal, and hence a mandamus is necessary to compel the performance of duty on the part of the treasurer.

The prayer of the board is that the treasurer be ordered to pay for any bonds that may be bought under its direction, as provided by law, or show cause to the contrary.

The following is the return of the treasurer—or at least the substance of same, as exhibited by printed extracts we have selected from his brief, to-wit:

" Now comes respondent, and for answer and cause why the mandamus herein sued out should not be made peremptory, and why he should not pay for bonds as demanded, shows as follows:

" That an investment of the kind proposed could not legally be made by the Board of Liquidation, and the necessary funds therefor disbursed by respondent for the following reasons:

" That while the Constitution of 1879 does not curtail or abolish the duties of the Board of Liquidation, so far as they relate to the issuance of consolidated bonds, it has revoked and withdrawn from the auditor and treasurer all of the powers conferred by Act No. 3 of 1874. That continuing appropriations for interest and redemption of bonds made by the act of 1874, and supplementary acts of 1877 (Act No. 58, regular session, and Act No. 77, extra session), were inconsistent with Art. 43 of the new Constitution, which prohibits money from being taken out of the State treasury except in pursuance of a specific appropriation, and the Legislature from making an appropriation for a greater length of time than two years."

   *    *    *    *    *    *    *    *

He refers to State ex rel. E. Gross vs. Auditor, 35 An. 537, and St. Cyr vs. Auditor, unreported, as adjudications of this court sanctioning his view. Also Hart vs. Burke, 33 An. 458, to the same purport.

He also cites Elliott vs. Jumel, 107 U. S. 711, for the purpose of demonstrating the correctness of his view to the effect that the State had, through the instrumentality of the Debt Ordinance of 1879, withdrawn from its officers the powers conferred by the constitutional amendment of 1874.

State ex rel. Board of Liquidation vs. State Treasurer.

The extract from that opinion which is relied upon is the following, viz.:

The Supreme Court of the United States said: "It is equally manifest that the *object* of the State in adopting the debt ordinance of 1879 was to stop the further levy of the promised tax, and to prevent the disbursing officers from using the revenue from previous levies to pay interest falling due in January, 1880, as well as the principal and interest maturing thereafter," and "that the Constitution of 1879, on its face, takes away the power of the executive officers to comply with the act of 1874 can not be denied. As against everything but the outstanding bonds and coupons, this Constitution is the fundamental law of the State, and it is only invalid so far as it impairs the obligation of the contract on the faith of which the bonds and coupons were taken by their respective holders."

The respondent then summarizes the legislation of the State since the adoption of the Constitution and Debt Ordinance of 1879, for the purpose of showing contemporaneous legislative construction of their provisions favorable to his theory, as follows:

"The new Constitution limits taxation to six (6) mills and makes no provision for a sinking fund, and the Legislature has failed to do so, either by an appropriation or reservation of surplus or other money.

"That in Act No. 75 of 1882, and Section 89 of Act No. 85 of 1888, transferring all surplus interest money to the general fund, we have legislative constructions of the Debt Ordinance. The Legislature has declared all funds continuing funds, and made it the duty of the Treasurer to transfer surplus interest money to the general fund of the same year without waiting for legislative action.

"That Act No. 75 of 1882 transferred the surplus interest fund for the years 1880, 1881, 1882, 1883 and 1884, collected or collectible and appropriated to pay the interest on the consolidated and constitutional bonds of the State, to the general funds of said years.

"That Act No. 107 of 1884, in Section 5, page 139, provides that the surplus of the interest tax shall be applied to the general fund tax, and in Section 12 repeals all laws or parts of laws in conflict with said act.

"That Act No. 96 of 1886, Section 98, page 161, applies all surplus in excess of $480,000 to the general fund, and by Section 95 repealed all laws or parts of laws in conflict with said act.

"That Act No. 85 of 1888, in the first paragraph of Section 89, applied to the general fund all the surplus of the interest tax fund, and in the same section makes it the duty of the State Treasurer, without legislative action, to make transfers of any and all balances after providing for the payment of all warrants drawn against the several funds, to the credit of the same funds for the succeeding years, except as otherwise provided for, and by Section 92 repeals ' all those parts of laws on the subject of levy, assessment and collection of State taxes heretofore enacted which are in conflict with the Constitution of the State, or are inconsistent with, or superseded by, or in conflict with the provisions of said act.'

"That the Acts No. 3 of 1874 and No. 58 of 1877 have been repealed by the Acts of 1882, 1884, 1886 and 1888, above quoted.

"That all surplus to the credit of any and all funds being under the provisions of said Acts of 1882, 1884, 1886 and 1888, transferred to the credit of the same funds for the ensuing years, except the surplus to the credit of the interest fund, which is specially transferred to the credit of the general fund, the same can now only be withdrawn from the treasury in pursuance of specific legislative appropriation.

    *      *      *      *      *      *      *      *

"Respondent further shows that the construction of Article 43 of the Constitution, which would prevent the proposed investment, is the same that has been adopted by the Treasurer since 1880, under the advice of the Attorney Generals, as will appear from the following extracts from opinions on file in this office: ' The prohibition in Article 43 of the Constitution against drawing money from the treasury except in pursuance of a specific appropriation made by law, applies to and covers all money in the treasury, whether deposited or paid in before or after the adoption of the Constitution of 1879.   It is also an elementary and fundamental principle of free government, and even in the absence of a specific constitutional prohibition, money could not be drawn out of the treasury, directly or indirectly, without legislative authority."

The treasurer then concludes his return as follows, viz.:

"That by no act of theirs, has the Legislature, or State officers or members of the Board of Liquidation, recognized the acts of 1874 and 1877, relating to a ' redemption fund,' as having been in force since the adoption of the Constitution of 1879, and no transfer made

or even suggested to be made to the ' redemption of the public debt fund' for investment in bonds and coupons in the manner originally provided for in the acts of 1874 and 1877.

" While respondent admits that he favors the policy of retiring State bonds and past due coupons with the interest tax surplus, he respectfully submits to the court that for the reasons herein stated the Board of Liquidation has no authority to make the proposed purchase of bonds and coupons, and respondent no authority to make the necessary disbursement therefor."

A close analysis of respondent's return discloses the following to be his defences, viz.:

*First*—That the Constitution of 1879 has revoked and withdrawn from the auditor and the treasurer all the powers conferred by Act No. 3 of 1874.

*Second*—That the continuing appropriations for interest and the redemption of bonds provided by said act, and those supplementary thereto, were and are inconsistent with Art. 43 of the Constitution of 1879.

*Third*—That the Constitution of 1879 limits taxation to six (6) mills, and makes no provision for a sinking fund, and that no legislative enactment, since its adoption, has made any such provision.

*Fourth*—That, by various legislative acts since 1880, the surplus of the interest collected has been given an altogether different destination, inconsistent with the provisions of the acts of 1874 and 1877.

*Fifth*—That all the foregoing precepts of constitutional and statute law favor his theory, and are diametrically opposed to those advanced by the relator.

On the trial there was judgment in favor of the relator, and the respondent has appealed.

I.

It is important that the various provisions of the legislative enactments, and those of the Constitution of 1879, and the debt ordinances of 1879 and 1882, should be reproduced and collated for the purposes of comparison and careful analysis, as upon such comparison and analysis must depend a proper decision of the questions that are propounded in the respondent's return.

We have, therefore, collated and reproduced them in the order of their dates, viz.:

Section 7 of Act 3 of 1874—the funding law provides—

That a tax of five and a half mills on the dollar of the assessed value of all real and personal property in the State is hereby annually levied, and shall be collected for the purpose of paying the interest and 'principal of the consolidated bonds herein authorized, and the revenue derived therefrom is hereby set apart and appropriated to that purpose, and no other. And that it shall be deemed a felony for the Fiscal Agent or any officer of the State or board of liquidators to divert the said fund from its legitimate channel as provided, and upon conviction the said party shall be liable to imprisonment for not more than ten years nor less than two, at the discretion of the court. If there shall, during any year, be a surplus arising from said tax after paying all interest falling due in that year, such surplus shall be used for the purchase and retirement of bonds authorized by this act, said purchases to be made by said board of liquidation, from the lowest offers, after due notice; *provided,* that the total tax for interest and all other State purposes, except the support of public schools, shall never hereafter exceed twelve and a half mills on the dollar. The interest tax aforesaid shall be a continuing annual tax until the said consolidated bonds shall be paid or redeemed, principal and interest; and the said appropriation shall be a continuing annual appropriation during the same period, and this levy and appropriation shall authorize and make it the duty of the Auditor and Treasurer, and the said board, respectively, to collect said tax annually, and pay said interest and redeem the said bonds until the same shall be fully discharged.

This act was, at the same session of the Legislature, given the shape of a proposed constitutional amendment, and it was subsequently submitted to and adopted by the people as a part of the organic law.

The issue of consolidated bonds authorized by the General Assembly of the State, at its regular session in the year 1874, is hereby declared to create a valid contract between the State and each and every holder of said bonds, which the State shall by no means and in no wise impair. The said bonds shall be a valid obligation of the State in favor of any holder thereof, and no court shall enjoin the payment of the principal or interest thereof, or the levy and collection of the tax therefor; to secure such levy, collection and payment, the judicial power shall be exercised when necessary. The tax required for the payment of the principal and interest of said bonds shall be assessed and collected each and every year until the bonds shall be paid, principal and interest, and the proceeds shall be paid by the Treasurer of the State to the holders of said bonds, as the principal and interest of the same shall fall due, and no further legislation or appropriation shall be requisite for the said assessment and collection, and for such payment from the treasury.

Whenever the debt of the State shall have been reduced below twenty-five million dollars, the constitutional limit shall remain at the lowest point reached, beyond which the public debt shall not thereafter be increased; and this rule continue in operation until the debt is reduced to fifteen million dollars, beyond which it shall not be increased. Nor shall taxation for all State purposes, excepting the support of public schools, ever exceed twelve and a half mills on the dollar of the assessed valuation of the real and personal property in the State, except in case of war or invasion.

The revenue of each year derived from taxation upon real, personal and mixed property, or from licenses, shall be devoted solely to the expenses of the said year

14          SUPREME COURT OF LOUISIANA.

State ex rel. Board of Liquidation vs. State Treasurer.

for which it shall be raised, excepting any surplus remain, which shall be directed to sinking the public debt. All appropriations and claims in excess of revenue shall be null and void, and the State shall in no manner provide for their payment.

In pursuance of the funding statute and the constitutional amendment of 1874, the Legislature of 1877 passed the following act, to-wit:

In addition to the duties already prescribed, it shall be the duty of the Treasurer to set apart annually out of the proceeds of the five and a half mills tax, an amount equal to the interest coupons maturing on the first day of July of said year and the first day of January next following, and the surplus, if any, remaining after said amounts shall have been collected and set aside, as well as the surplus, if any, resulting from the provisions of the third amendment to the Constitution of the State, proposed January twenty-fourth, eighteen hundred and seventy-four, and ratified at the general election held on the second of November, eighteen hundred and seventy-four, shall be deposited .with the Fiscal Agent at credit of a separate and distinct fund, to be called and known as the "Redemption of the Public Debt Fund," and shall be used exclusively, under the direction of said Board of Liquidation, for the retirement and sinking of consolidated bonds and past due interest coupon to be purchased from bidders offering the same at the lowest price, after thirty days' notice in the official journal of the State, and such other papers as may be selected by the board, which notice shall be given whenever said Redemption Fund shall amount to one hundred thousand dollars —Extract from Sec. 9, Act 58 of 1877, Regular Session.

That section two of said Act amending and re-enacting section nine of the original Act number three shall be and is hereby amended and re-enacted so that that portion of section nine as amended in said Act number fifty-eight beginning from the title "Treasurer" to and including the word "President," preceding the word "Auditor," shall read as follows, to-wit: "Treasurer—First: In addition to the duties already prescribed, it shall be the duty of the Treasurer to set apart annually, out of the proceeds of the five and a half mills tax, an amount equal to the interest coupons maturing on the first day of July of said year and the first day of January next following, and the surplus, if any, remaining after said amounts shall have been collected and set aside, as well as the surplus, if any, resulting from the provisions of third amendment of the Constitution of the State proposed January twenty-four, eighteen hundred and seventy-four, and ratified at the general election held on the second of November, eighteen hundred and seventy-four, shall be deposited with the Fiscal Agent at credit of a separate and distinct fund, to be called and known as the 'Redemption of the Public Debt Fund,' and such amount as may remain at credit of the said redemption fund after deducting therefrom the sum necessary to cover matured coupons remaining in arrear shall be used exclusively, under the direction of said Board of Liquidation, for the retirement and sinking of consolidated bonds to be purchased from bidders offering the same at the lowest price, after thirty days' notice in the official journal of the State and such other papers as may be selected by the board, which notice shall be given whenever said redemption fund shall amount to one hundred thousand dollars. If any deficit occur in the collection of the five and a half mills interest tax of any year, leaving interest coupons of said year unpaid, then, and only then, that portion of the surplus revenue deposited in conformity to this Act at credit of the Redemption of the Public Debt Fund which may be derived from sources other than the said five and a half mills tax may be

applied by the Board of Liquidation to the payment of such unpaid coupons with a view of maintaining the credit of the State. In conformity to the constitutional amendment number three, of one thousand eight hundred and seventy-four, it is hereby made the duty of the Treasurer to keep separate accounts of the income and expenditures of each fund in each year, and after setting apart or paying out an amount thereof equal to the appropriations and warrants lawfully made against each of said funds, the surplus, if any remain, shall be immediately deposited by the Treasurer at the credit of the 'Redemption of the Public Debt Fund,' and the Board of Liquidation is hereby authorized to require from the Treasurer or Fiscal Agent at any time a statement of the condition of any such fund or funds. No bid shall be entertained for any bond to an amount exceeding par; and the board shall always have reserved to itself the right and privilege of rejecting any and all bids, but shall publish in the official journal the result of its proceedings concerning such redemption or refusal to accept any of the bids made. If bids are offered in excess of the surplus on hand, they shall be reduced to correspond with such surplus, and the award be made in favor of the lowest bidder or bidders. For all bonds redeemed and retired in conformity to law payment shall be made by the State Treasurer on the order of the board, attested by its president and secretary."—Sec. 1 of Act 77 of 1887, Extra Session.

The following is an exact reproduction of the Debt ordinance of 1879, viz.:

## STATE DEBT.

ARTICLE 1. *Be it ordained by the people of the State of Louisiana, in Convention assembled,* That the interest to be paid on the consolidated bonds of the State of Louisiana be and is hereby fixed at two per cent. per annum for five years from the first of January, 1880, three per cent. per annum for fifteen years, and four per cent. per annum thereafter, payable semi-annually; and there shall be levied an annual tax sufficient for the full payment of said interest, not exceeding three mills, the limit of all State tax being hereby fixed at six mills; *provided,* the holders of consolidated bonds may, at their option, demand in exchange for the bonds held by them, bonds of the denomination of five dollars, one hundred dollars, five hundred dollars, one thousand dollars, to be issued at the rate of seventy-five cents on the dollar of bonds held and to be surrendered by such holders, the said new issue to bear interest at the rate of four per cent. per annum, payable semi-annually.

ART. 2. The holders of the consolidated bonds may at any time present their bonds to the Treasurer of the State, or to an agent to be appointed by the Governor —one in the city of New York and the other in the city of London—and the said Treasurer or agent, as the case may be, shall indorse or stamp thereon the words, 'interest reduced to two per cent per annum for five years from January 1, 1880, three per cent. per annum for fifteen years and four per cent. per annum thereafter;" *provided,* the holder or holders of said bonds may apply to the Treasurer for an exchange of bonds, as provided in the preceding article.

ART. 3. *Be it further ordained,* That the coupon of said consolidated bonds falling due the first of January, 1880, be and the same is hereby remitted, and any interest taxes collected to meet said coupon are hereby transferred to defray the expenses of the State government.

*Be it further ordained, and it is hereby ordained by this Constitutional Convention,* That the foregoing provisions and articles relative to the consolidated debt shall not form a part of this Constitution, except as hereinafter provided, as follows:

At the election held for the ratification or rejection of this Constitution, it shall be lawful for each voter to have written or printed on his ballot the words, "For ordinance relative to State debt," or the words, "Against ordinance relative to State debt," and in the event that a majority of the ballots so cast have indorsed on them the words "For ordinance relative to State debt," then the said foregoing provisions and articles of this ordinance shall form a part of the Constitution submitted if the same is ratified; and if a majority of the votes so cast shall have indorsed on them the words, "Against ordinance relative to State debt," then said provisions and articles shall form no part of this Constitution.

The following is from the debt ordinance as amended in 1882, viz. :

ACT No. 76 OF 1882.

STATE DEBT.

ARTICLE 1. *Be it ordained by the people of the State of Louisiana, as provided by law,*. That the State Debt Ordinance be amended so as to read as follows: That the interest to be paid on the Consolidated Bonds of the State of Louisiana be and is hereby fixed at two per centum per annum for five years, from the first day of January, one thousand eight hundred and eighty (1880), and four per centum per annum thereafter, payable semi-annually; and there shall be levied an annual tax sufficient for the full payment of said interest, not exceeding three mills, the limit of State tax for all purposes being hereby fixed at six mills; and said bonds and coupons shall be duly stamped: "Interest reduced to two per centum per annum for five years from January 1, one thousand eight hundred and eighty, and four per centum per annum thereafter."

This amendment was regularly submitted to and adopted by the people, and became part of the Constitution in 1884, and has remained unaltered to this time.

We append, also, the following summary of the legislative enactments since adopted and upon which the treasurer' principally relies—the selections are made from the brief of the respondent's counsel, viz.:

" The Legislature has frequently construed the Debt Ordinance as repealing the legislative provisions creating the Redemption of Public Debt Fund and providing for the purchase of bonds. The first act of this character is Act No. 77 of 1880, which, in the first paragraph of Sec. 4, provides that ' the surplus of said tax shall be applied to the establishment, maintenance and support of the free public schools throughout the State.'

"The next expression of the Legislature upon this subject is to be found in Joint Resolution No. 75, of the Session of 1882, which provides that ' the excess of interest in the treasury collected or collectible, and appropriated to pay the interest on the Consolidated and Constitutional bonds of the State, and General Account Fund,.

shall be turned over and credited to the General Fund of 1880, 1881, 1882, 1883 and 1884, the excess of each year being credited to the General Fund of said year.' The Legislature, the same year, in Act No. 96 of 1882, in the first paragraph of Sec. 77, ordained that 'the surplus of said tax should be applied to the General Fund.'

"Again in 1884, by Act No. 107, at pp. 138 and 139, the surplus of the Interest Tax for 1884 was applied to the Current School Fund, and for 1885 and subsequent years to the General Fund.

"Act No. 98 of 1886, treating of the disposition of the Interest Fund, contains the following provision: ' That not more than $480,000 of the interest, so collected, shall be applied to the payment of the interest due on said consolidated bonds and the surplus of said tax to be applied to the General Fund.'

" The last expression of legislative construction of the State Debt Ordinance will be found in Act No. 85 of 1888, Sec. 89, where the same disposition is made of the surplus as in the previous acts hereinabove quoted.

" It appears from the acts cited above that the uniform interpretation of all the Legislatures, that have acted upon the question, is, that the State Debt Ordinance of 1879 abolished the ' Redemption of the Public Debt Fund,' and authorized the levy of a tax for the payment of the *interest only*, the surplus, if any, arising from said tax to be under control of the Legislature and payable only in pursuance of specific appropriation thereof, under the limitations imposed by Art. 43 of the Constitution of 1879 and all other limitations of that instrument."

## II.

Taking a comprehensive view of the foregoing provisions of law —statutory and constitutional—it is evident that there is imposed upon the respondent the ministerial duty that is clearly outlined in the relator's petition; therefore, the question of controlling importance in this case is whether or not same have been repealed by subsequent legislation. For it is provided by the funding act of 1874 that the levy and appropriation therein provided for "shall authorize and make it the duty of the auditor and the treasurer, and the said board, respectively, to collect said tax annually, and pay said interest and redeem the said bonds, until the same shall be fully discharged."

2

The constitutional amendment of 1874 provides that " the tax required for the payment of the principal and interest of said bonds shall be paid, principal and interest, and the proceeds shall be paid by the treasurer of the State to the holders of said bonds, as the principal and interest shall fall due," etc.

The legislative enactment of 1877 (regular session) provides that the treasurer shall " set apart annually, out of the proceeds of the five and one-half mill tax, an amount equal to the interest coupons maturing on the first day of July of said year, and the first day of January next following; and the surplus, if any remaining after said amounts shall have been collected and set aside, as well as the surplus, if any, resulting from the provisions of the third amendment to the Constitution of the State, proposed January 24, 1874, * * * shall be deposited with the fiscal agent at credit of a specific and distinct fund to be called and known as the ' Redemption of the Public Debt Fund,' and shall be used exclusively, under the direction of said Board of Liquidation, for the retirement and sinking of consolidated bonds and past due coupons, to be purchased from bidders offering the same at the lowest price," etc.

The legislative enactment of 1877 (extra session) further elaborates and enlarges the powers of the officers charged with the performance of the functions of the funding law, and declares that "it shall be the duty of the Treasurer to set apart annually, out of the proceeds of the five and a half mills tax, an amount equal to the interest coupons maturing on the 1st day of July of said year, and the 1st day of January next following; and the surplus, if any, remaining after said amounts shall have been collected and set aside, as well as the surplus, if any, resulting from the provisions of the third amendment of the Constitution * * * shall be deposited with the fiscal agent at a credit of a separate and distinct fund, to be called the ' Redemption of the Public Debt Fund,' etc." And it further provides that " it is hereby made the duty of the Treasurer to keep separate accounts of the income and expenditures of each fund in each year; and, after setting apart or paying out an amount thereof equal to the appropriations and warrants lawfully made against each of said funds, the surplus, if any remain, shall be immediately deposited by the Treasurer at the credit of the Redemption of the Public Debt Fund, and the Board of Liquidation is hereby authorized to require from the Treasurer or from Fiscal Agent, at any time, a statement of the condition of any such fund or funds."

To determine whether the foregoing have been repealed we must keep in mind other provisions of the funding laws and the constitutional amendment of 1874, as well as those quoted, and compare them with the provisions of the debt ordinance of 1879, which, it is contended, had the legal effect of producing an *implied* repeal thereof.

The constitutional amendment of 1874 declares amongst other things that the issue of consolidated bonds, authorized by the funding law of that year, created a valid contract between the State and the bondholders " which the State could by no means impair. That the tax required for the principal and interest of said bonds shall be assessed and collected each and every year until the bonds shall be paid, principal and interest."

But the most important provision of said amendment is to be found in its last section, which reads as follows, viz.:

" The revenue of each year derived from taxation upon real, personal and mixed property, or from licenses, shall be devoted solely to the expenses of the said year for which it shall be raised, *excepting any surplus remain, which shall be directed to sinking the public debt.*"

In this wise the legislation of 1877 appears to follow the plain and unambiguous precepts of the constitutional amendment, both of which plainly contemplate and require the surplus interest accumulations to be seggregated and kept apart from other funds, and especially consecrated to " the sinking fund of the public debt," capital and interest.

The remaining question for consideration is the purport and effect of the debt ordinance of 1879 upon the provisions of the funding laws and the constitutional amendment of 1874.

It must, however, be at once observed and kept in mind, that the debt ordinance forms no part of the Constitution, because it is therein formally declared " that the foregoing provisions and articles relative to the consolidated debt shall not form a part of this Constitution, except as hereinafter provided," etc.

Its provisions are entirely independent and separate from the body of the Constitution, though, at the same time, constituting an integral part of the organic law.

Now what are the provisions of the Debt Ordinance? When paraphrased they are as follows, to-wit:

*First*—That the interest to be paid on the consolidated bonds of the State be and is hereby fixed at two per cent. per annum for five years from the first of January, 1880; three per cent. per annum for fifteen years, and four per cent. per annum thereafter, payable semi-annually.

*Second*—That there shall be levied an annual tax sufficient for the full payment of said interest, not exceeding three mills, the limit of all State tax being fixed at six mills.

*Third*—That holders of said bonds were given the *option* to demand, in exchange for the bonds held by them, bonds of the denomination of $5, $100, $500 and $1000, to be issued at the rate of seventy-five cents on the dollar of bonds held,' and to be surrendered by such holders, the said new issue to bear interest at the rate of four per cent. per annum.

*Fourth*—That the holders of consolidated bonds not desiring to make such exchange can be permitted to' have their bonds stamped with the words "interest reduced," etc., so as to enable them to have the benefit of interest collections therein provided.

These are all the fundamental provisions of the ordinance. They deal exclusively with the *interest*, and not with the *capital* of the bonds, which were allowed to remain in *statu quo*. The fact of the bondholders being given the *option* to surrender their holdings and to receive other bonds in exchange, on the terms proposed therein, did not impair—nor purport to impair—the force or validity of those bonds as a binding contract between the State and the bondholders; nor do we think the framers of the ordinance entertained any such idea. And the *interest*, constituting, as it does in law, a part of the contract, was no more interfered with by the ordinance than was the capital of the bond, except as to the *rate* of interest bondholders were to receive. And the acceptance of this reduced interest depended upon the option of the bondholder, who was at liberty to decline to receive same; though it must be confessed that it left him without remedy to enforce the payment of the full rate of seven per cent., unless the State consented to let herself be sued. But, this question aside, it is clear that the ordinance not only did not impair the obligation of the contract, but specially recognized the existence and validity of the bonds, with their reduced interest, and made special provision for the payment of the interest, though the amount of the interest tax was reduced so as to correspond with the reduced rate of interest.

True it is, that Section three of the ordinance declares " that the coupons of said consolidated bonds falling due the first day of January, 1880, be and the same are hereby *remitted*, and any interest taxes collected to meet said coupons are hereby transferred to defray the expenses of the State government; " but this declaration only serves to enforce the view we have expressed in reference to the bonds and interest generally.

It is evident that it was not the intention or object of the framers of the ordinance to abrogate the constitutional amendment of 1874, or to repeal any legislative enactment under it; though it was confessedly their purpose and object to disembarrass the State by superinducing the bondholders' acceptance of a more economical and juster rate of interest upon its large bonded indebtedness, which was of more than questioned validity.

True it is that the Supreme Court did employ the language attributed to it in the respondent's return, which is to the effect "that the *object* of the State in adopting the debt ordinance of 1879 was to stop the further payment of the promised tax," but this expression was closely coupled in the same sentence with the further expression that it was likewise intended " to prevent the disbursing officers from using the revenue from previous levies to pay the interest falling due in January, 1880." But we are at a loss to perceive on what language of the *ordinance* the court predicated the expression that it was the object of its framers to prevent the payment of " the *principal and interest maturing afterward;*" and the further expression " that the Constitution of 1879 on its face takes away the power of the executive officers to comply with the act of 1874," etc.; and there is no article or provision of the body of the Constitution referred to, in the opinion of the court, which justifies this observation.

On the contary, the Constitution formally and in terms declares that " all rights, actions, prosecutions, claims and contracts, as well of individuals as of bodies corporate; and all laws in force at the time of the adoption of this Constitution, and not inconsistent therewith, shall continue as if said Constitution had not been adopted." Const., Art. 258.

This provision is certainly broad enough to save and except from its repealing effect the amendment of 1874 and legislation under it.

In addition to this, it is a noteworthy fact that the Supreme Court, in Louisiana vs. Jumel, 107 U. S. 711—the case relied upon by the

respondent—dealt with the interest coupons of 1880 alone, and consequently any expression of opinion in reference to other interest coupons or bonds was not authoritative as a precedent.

Our conclusion on this branch of the case is that the debt ordinance of 1879 did not reach and repeal the constitutional amendment of 1874 nor the legislation under it, but, on the contrary, left them in full force—with the solitary exception stated with regard to the reduction of the *rate* of interest and the diminution of the *amount* of the interest tax imputable thereto.

On this question our learned brother of the lower court expressed the following view, to-wit:

" It seems to me, that the Constitution of 1879 made no change whatever in the consolidated bonded debt of the State, except as to the remission of the interest called for by the coupons due January 1, 1880, and the reduction of the rate of interest from 7 per cent. by gradual steps to the rate at which it is now current, say 4 per cent. Dealing with the bonded debt, fixing the rate of interest and levying the tax to meet the annual interest, constituted an acknowledgment of the principal of the debt itself, as solemn and imposing as could have been made. The limit fixed in 1874 to the volume of the debt, the maturity of the debt at forty years from January 1, 1874, and the obligation of the State to meet and pay it within this term, together with all the essential details for the determination and funding, excluding the one particular of a change in the rate of interest, were as perfectly implied in the State debt ordinance of that instrument as if they had been reproduced and stated at length. When the Constitution of 1879 levied the annual tax to pay the interest it seems to me it did not mean to direct that the interest alone should be paid, and that the principal debt should not be paid, nor that if there should be an excess of money resulting from the interest tax, that such excess should be diverted to some purpose other than the purchase and retirement of the bonds, as occasion might admit, which purchase and retirement formed a part of the stipulations of the " contract " evinced by the legislation of 1874 and 1877 in the funding of said debt. On the contrary, it seems to me that all this was matter of necessary implication, which kept in force the special laws necessary for the continued funding and management and payment and cancellation of the bonded debt, in capital as well as in interest. By the terms of Art. 258 of that Constitution, all " rights,"

" claims," " contracts " and " laws " in force were continued in force, as if the said Constitution had not been adopted; provided, there was no inconsistency between them and its provisions. Wherein there is any inconsistency between its provisions and the acts of 1874 and 1877, except in the one particular of the rate of the annual interest on the bonded debt, I do not see. The amendment of 1874 to the Constitution, which was adopted for the purpose of carrying the funding act into full effect, levied the annual tax. The appropriation was thus then made, *quoad hoc*, specially, as a continuing appropriation, and wholly independent of the article which regulates ordinary State appropriations, by legislative act, and prohibits the withdrawal of money from the treasury without such act; and so, in like manner, the State debt ordinance, in the Constitution of 1879, has exactly the same effect—*i. e.*, as regards the bonded debt, it operates as a special continuing appropriation, untrammeled by the restrictions of Art. 43, which relates to other matters than the State debt.

" It has never been contended that the debt funded and still being funded, under the acts of 1874 and 1877, does not exist, nor that it must not be paid. No one has disputed the existence or the powers and duties of the board of liquidation under said acts to deal with said bonded debt. That board has been in the full exercise of its functions, under said acts, since 1875, in all respects, as if there had been no change in the organic law in 1879. All these facts borne in mind, it would seem passing strange if, in the one essential function, of greatest moment to the credit of the State and to the best interests of the people—to-wit: the payment and cancellation of this interest-bearing debt out of funds now available, to the extent of near half a million of dollars—the powers of this liquidating board should be held as of no efficacy to that end. How could such be the conclusion when the same acts which called it into existence, the same acts which provided all things regarding the bonded debt as it exists to-day, excepting only the rate of interest, authorized and directed this board to use all accumulated surplus of interest money for the purchase and retirement of the bonds in capital and interest, *et id usque ad finem*, until the entire bonded debt, that has so burdened the people, shall be entirely canceled?"

In these views we concur, as we regard them conclusive and unanswerable.

State ex rel. Board of Liquidation vs. State Treasurer.

If the theory of the respondent were not adequately and sufficiently answered it would find sufficient answer in the constitutional amendment of 1884, whereby the rate of interest was *increased*— thus specifically recognizing the debt as well as interest, and putting a different interpretation on the debt amendment of 1879 from the one entertained by the Supreme Court.

Recurring to the amendment of 1874, it is worthy of observation that it directs and requires that if there shall remain any *surplus* of revenue in any year it *"shall* be directed to sinking the *public debt,"* and that language necessarily includes the principal as well as the interest.

Having reached the conclusion that the amendment is still a part of the organic law, unrepealed by the Constitution of 1879, or the debt ordinance thereto appended; and the State finding herself able and willing to perform an act of justice to her *contract* creditors, we feel disposed to sanction that desire and put its provisions in force, notwithstanding same have lain dormant for a time.

### III.

On the second proposition of the respondent to the effect that the continuing appropriation for interest and the redemption of the bonds, provided in the funding legislation, is inconsistent with Art. 43 of the Constitution of 1879, little be said; for, as already shown, the debt ordinance segregated the debt settlement from all other questions that were treated of in the body of the Constitution, and the two were separately submitted to the people; and hence the two are to be construed as harmonizing, unless necessarily repugnant to each other.

And in our opinion such is not the case in the instance suggested by the respondent.

### IV.

Much the same answer may be made to the third proposition of the respondent, that the Constitution limits taxation to six (6) mills, and makes no provision for a sinking fund. But, as we have seen, the constitutional amendment of 1874—which is still in force—declares, in mandatory terms, that any *surplus* of interest shall be devoted to *"the sinking of the public debt,"* the subsequent legislation on the subject does revoke such provision, and same is perfectly compatible therewith.

## V.

In so far as any legislative enactments of dates subsequent to the adoption of the Constitution may have given a different destination to the tax interest surplus of any one or more years, they can not furnish to this court a rule for the interpretation of the constitutional amendment of 1874, as the latter is paramount and must prevail over any contrary statutory enactment.

All statutes enacted subsequent to the adoption of the debt ordinance must be construed in conformity thereto.   And, in fact, all of such subsequent enactments dealt with, and only proposed to deal with, an *existing fund* already collected under existing laws, and could only lead to the supposition that the laws of 1874 and 1877 were not operative on said funds.

All of said statutes are simply revenue laws of the several years in which they were enacted, and did not in terms, or in effect, repeal the laws of 1874 and 1877; and had such been the purpose of the Legislature in their enactment, it was vain and nugatory on account of the substance of the funding act of 1874 having become absorbed into the constitutional amendment of that year, and it not having since been abrogated or repealed.

These legislative acts are thus treated and disposed of by the district judge, viz.:

" I have also examined the revenue acts of 1884-86-88.   As legislative interpretations regarding the bonded debt and its settlement they are met by the contrary inferences to be drawn from the joint resolution No. 72 of 1888, and the failure of the house bill No. 280 in 1892.

" As repealing statutes, express or by implication, I think they do not affect the legislation of 1874 and 1877, for several reasons:

" 1. They are current revenue, or ' ways and means ' acts, and in their titles there is not the slightest mention or reference to the matters of essential substance contained in the acts of 1874 and 1877, which it is argued they have repealed.

" 2. They are not on the same subject matter as the acts of 1874 and 1877.

" 3. They do not purport to prohibit the application of the interest fund to the cancellation and retirement of the capital of the debt, as directed by the acts of 1874 and 1877, whenever there is a surplus.

" 4. If the levy of the continuing tax, by the State debt ordinance of 1879, be in itself an appropriation by the Constitution, they can have no effect to the contrary.

"The same considerations are applicable to the joint resolution of 1882, but on the admitted facts regarding the several funds, none of these acts, unless possibly the act of 1882, could have any effect, in any event, upon the present issue."

In these views we also concur, as we believe them to be sound and correct.

We have given this case most careful, consideration—such as the gravity of the same demanded, and are of the opinion that the judgment appealed from is correct, and we adopt the concluding part of the opinion of the district judge as our own, as it is the embodiment of the law, as well as of the philosophy of the case:

" Thus interpreting the laws herein involved, my opinion is that the interest fund, required to be levied by the debt ordinance of 1879, is the debt fund, sacred not only for the current interest, but for the capital of the debt. I think that, as a constitutional appropriation, there is no authority to divert it. I think that all the essential details adopted in 1874 and 1879 for the determination, funding, management and ultimate payment of the bonded debt are in full force, and that it is the duty of the Board of Liquidation, whenever there is a sufficient surplus, to promptly use it for the purchase and retirement of State bonds, and thus not only lightening the burdens of the people, but free the revenues of the State from the embarrassments of debts that were fastened upon her in the evil days that befell her in long ago, in order that they may find application more liberally for the education, protection and general welfare of her people."

Judgment affirmed.

Mr. Justice Parlange recused, having been a member of the Board of Liquidation.

Mr. Justice McEnery absent, sick.